UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

CLAUDE LEWIS,

                                                        Civil Action No:
                                                        14: CV-02302 (TPG)

                          Plaintiff,

                                                        <u>AMENDED COMPLAINT</u>

          -against-
                                                        Trial by Jury Demanded

AMERICAN SUGAR HOLDING, INC, and
MEHANDRA RAMPHAL,

                          Defendants.
-------------------------------------------------------------------X

**PLAINTIFF CLAUDE LEWIS** (hereinafter referred to as "Plaintiff"), by his attorneys,

Nesenoff and Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor,

New York, New York 10001, amends his Complaint and alleges, upon knowledge with respect

to herself, and upon knowledge, information and belief as to all other matters, as follows:

<u>STATEMENT OF THE CASE</u>

1.      This is a proceeding to enforce the rights of the Plaintiff and other persons

similarly situated, to equal employment opportunities, their rights as employees, and their civil

rights as citizens of the United States and as New York State residents.  Plaintiff seeks money

damages, as well as an injunction restraining Defendants from maintaining a policy, practice,

custom and/or usage of:

a.      Discrimination against Plaintiff and other persons similarly situated because of

race, color, and national origin with respect to compensation, terms, conditions, and

privileges of employment, including without intending to limit, hiring, transfer,

promotion and pay; and

b.      Limiting, segregating and classifying employees of Defendants in ways which deprive Plaintiff and other persons similarly situated of equal employment opportunities and/or otherwise adversely affecting their status as employees because of race, color and national origin.

2.      Defendants have consistently and/or purposefully and/or negligently deprived Plaintiff and other persons similarly situated of the rights guaranteed to them under Federal and New York State Laws with the intent and design, both directly and indirectly, of fostering a hostile work environment resulting from race, color, and national origin discrimination, as well as retaliation, to the detriment of the Plaintiff and other persons similarly situated.

## THE PARTIES

### Plaintiff

3.      Plaintiff is an African-American male citizen of the United States who currently resides in Yonkers, New York.

4.      Plaintiff is currently employed by the Defendant American Sugar Holding Inc. (hereinafter referred to as "Defendant American Sugar"), a cane sugar refining company, where he has worked since 1988.

5.      Plaintiff was employed at Defendant American Sugar at all relevant times.

6.      Plaintiff is an employee within the meaning of the New York State Executive Law, the New York City Human Rights Law and the federal employment discrimination laws known as "Title VII."

7.      Plaintiff was willing and able to perform his employment duties and obligations and was qualified for the employment positions he held at Defendant American Sugar and from which he was demoted.

**Defendants**

8.      Upon information and belief, at all times herein, Defendant American Sugar is a corporation duly organized and existing under the laws of the State of Delaware and is registered to do business in the State of New York.  Defendant American Sugar's headquarters is located at One Federal Street, Yonkers, New York 10702.   Upon information and belief, Defendant American Sugar employs more than 100 employees.

9.      Defendant American Sugar was, at all times relevant herein, an "employer" within the meaning of 42 U.S.C. § 2000e-(b), as well as the Executive Law of New York State and New York City Human Rights Law.

10.      Defendant Mehandra Ramphal is an employee of Defendant who, upon information and belief, was recently promoted to Superintendent of Processing at Defendant American Sugar (hereinafter "Defendant Ramphal").   Defendant Ramphal is of Guyanese descent. At all relevant times, Plaintiff was required to directly report to Defendant Ramphal.

## JURISDICTION AND VENUE

11.      This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendants' long and continuing pattern of discrimination of Plaintiff based on race, color and national origin as well as retaliation against Plaintiff.

12.      This Court has Jurisdiction over this action under 42 U.S.C.A. § 1981 et. seq., 42 U.S.C.A. § 2000(e) et. seq., 29 U.S.C. § 621 et. seq., and under 28 U.S.C.A. §§1331 and 1343(4).  This Complaint is brought pursuant to Article 15 of the New York Executive Law, specifically Exec. Law §§ 290 et seq., (the 'Executive Law"), which is known as the Human Rights Law, and Title 8 of the Administrative Code of the City of New York, to redress discrimination with respect to terms and conditions or privileges of employment.

13.     This court has additional supplemental and pendant jurisdiction over all related claims.

## PROCEDURAL BACKGROUND

14.     Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about March 14, 2013.  Plaintiff originally filed this action on or about March 27, 2014, within ninety (90) days of his receipt of the Notice of Right to Sue issued by the EEOC on or about February 7, 2014.  Plaintiff initially filed his Summons and Complaint as a Pro Se Plaintiff.

15.     In or about August of 2014, Plaintiff retained the undersigned to represent him, and was granted until September 30, 2014 to amend the Complaint.

16.     Plaintiff seeks to recover attorneys' fees incurred by this lawsuit pursuant to N.Y. Exec Law. §§ 297 and/or the Administrative Code of the City of New York.

17.     This Complaint is additionally brought pursuant to any other cause of action which can be inferred from the facts set forth herein.

18.     Plaintiff demands a jury trial.

## OPERATIVE FACTS

**Plaintiff's Career at Defendant American Sugar**

19.     Plaintiff was hired by Defendant American Sugar in 1988.

20.     Plaintiff quickly noticed that African-American employees were often treated less favorably than Caucasian employees.  Specifically, Caucasian employees were often given preferential overtime opportunities, punished less often and less severely for the same alleged infractions, and had their employment-related complaints responded to more frequently and more positively by Human Resources.

21.     Still, Plaintiff was happy to be able to earn a living to support his family and he accepted the racial discrimination as an unfortunate reality.  Plaintiff was also pleased about the overtime opportunities that allowed Defendant American Sugar employees to make a significant hourly rate.  Although Defendant American Sugar assigned overtime based on seniority, because Plaintiff was almost always willing to pick up overtime shifts, he was able to enjoy the extra income from time to time.  He looked forward to becoming more senior so that he could earn more overtime pay.

**Defendant Ramphal Purposefully Causes Plaintiff to Lose Overtime and Holiday Pay**

22.     Plaintiff was very proactive about accepting overtime, which was up to Supervisors to offer by way of Seniority, especially if the overtime shift preceded or followed a holiday, because employees did not receive holiday pay if they failed to work the shift before or after the holiday.

23.     In or about November of 2009, Plaintiff ended up working an overtime shift that was being supervised by Defendant Ramphal.  Plaintiff had never worked for Defendant Ramphal before.  At the end of the shift, Defendant Ramphal approached Plaintiff and another worker named Dante and advised them that an overtime shift was available on Saturday following the Thanksgiving break.  He asked if they would be interested if more senior employees did not accept the overtime.

24.     Plaintiff responded that he would happily accept the overtime if it was available.

25.     Defendant Ramphal stated that he would let him know.

26.     Plaintiff was never offered the overtime and assumed a more Senior employee accepted the overtime.

5

27.     When Plaintiff received his paycheck however, he was shocked to see that he had been docked his holiday pay and assumed that a mistake had been made.

28.     Plaintiff immediately approached his Union Representative and advised him that he had been denied his holiday pay even though he had not called off or refused to work a shift before or after the Holiday.

29.     The Union Representative investigated and soon advised Plaintiff that Defendant Ramphal advised them that he had not been paid for the holidays because he had refused to work the overtime shift following the Thanksgiving Holiday.

30.     Plaintiff advised the Union Representative that that was not true.   Plaintiff complained to Defendant Human Resources, but they advised him that he could not file a grievance and would not be paid the holiday because Defendant Ramphal said that he had offered him the overtime.   Plaintiff advised that Dante had overheard the conversation and knew that Plaintiff had responded that he would perform the overtime if it was available.   Upon information and belief, Defendants refused to investigate.

31.     Upon information and belief, Plaintiff had always received Holiday Pay during his twenty-six year career at Defendant American Sugar because he always accepts any offered shift at that time.

32.     Plaintiff could not understand why Defendant Ramphal had purposefully manipulated the overtime system so that Plaintiff would not receive the overtime shift or holiday pay and then lied about it.

33.     Still, Plaintiff was able to shake off the bizarre and unfair treatment he had suffered at the hands of Defendant Ramphal, and was even able to look past Defendant American Sugar's mishandling of the unfair treatment.

**Plaintiff Endures Race and National Origin Discrimination at the Hands of Defendant Ramphal**

34.    Plaintiff continued to enjoy his career at Defendant American Sugar until in or about the Spring of 2011, when he was re-assigned to the position of "Remelt Operator."  As a Remelt Operator, he was paid approximately $23 an hour, plus time and a half for overtime work.

35.    Upon accepting the Remelt Operator position, Plaintiff was required to engage in a long training process, where he worked with other operators to learn how to run a Remelt Station.

36.    Upon completion of his training, Plaintiff was soon assigned a shift.  He was required to report to the then Remelt Supervisor who happened to be Defendant Ramphal.

37.    Plaintiff was immediately taken aback when Defendant Ramphal refused to answer his questions or offer any assistance to him as he became more familiar with his new role and with the remelt machine, which required constant monitoring and adjustment.  Plaintiff was especially taken aback, because he had never encountered a Supervisor who refused to assist his employees during his many years at Defendant American Sugar.

38.    Plaintiff continued to ask Defendant Ramphal questions about the machine and the process because he wanted to understand the remelting machine and the remelting process.

39.    Plaintiff had to repeatedly ask the same questions because Defendant Ramphal repeatedly refused to answer him.  When Plaintiff inquired as to why Defendant Ramphal would not answer his questions, he was told "I don't need to answer you" or "I don't want to hear any more questions from you."

40.    After a while, Plaintiff noticed that Defendant Ramphal answered questions when non-African-American remelters asked questions or required assistance with the machines that

they were operating.  Plaintiff wondered if Defendant Ramphal had "a problem" with people of African-American descent.

41.     Soon, Defendant Ramphal's responses took a very racist turn which proved that he did have "a problem" with people of African-American descent.  Defendant Ramphal told Plaintiff that he "[did not] know why you people always have to ask so many questions."  He also repeatedly told Plaintiff that he was "just as bad" as another African-American employee named Bobsie Monroe.  Defendant Ramphal would shake his head and mutter "you people."  He would also say, "You and Bobsie, I don't know why you have to ask so many questions" and "you're just as bad as Bobsie [Monroe]."

42.     Upon information and belief, Defendant Ramphal was referring discriminatorily to African-American employees when he used the phrase "you people."

43.     Defendant Ramphal also regularly began cursing and screaming at Plaintiff. He repeatedly told him to "shut the fuck up," that he was "being an asshole," and "to keep his fucking mouth closed."  Defendant Ramphal did not curse or scream at Guyanese employees.

44.      Defendant Ramphal also regularly told Plaintiff and other Defendant employees, including his own managers, that "only Guyanese people knew how to make sugar," that "Guyanese people have sugar making in their DNA," and that "Guyanese people are better at sugar processing than anyone else."

45.     Defendant Ramphal talked about "processing sugar the right way, like the way we did in Guyana."  He would tell Plaintiff, "You people don't know how to make sugar."

46.     Defendant Ramphal also started harassing Plaintiff by calling him on his walkie talkie prior to his shift to give him shift orders.  He would then scream and yell at Plaintiff for not responding to him before Plaintiff's shift started.  At no point in his career at Defendant

American Sugar had any other supervisor badgered or harassed Plaintiff by calling his walkie talkie when Plaintiff was not on the clock.

47.    Plaintiff and Defendant Bobsie were the only African-American employees who Defendant Ramphal supervised and they were the only employees that were singled out and treated in a rude, nasty and disrespectful manner.

**Plaintiff is Denied his Request to Meet with Human Resources to Discuss Ramphal's Behavior**

48.    On or about September 11, 2011, Plaintiff had had enough and decided to ask for a meeting with Defendant Ramphal's Supervisor, Elizabeth Mendonca ("Supervisor Mendonca").  Supervisor Mendonca regularly refused to meet with Plaintiff though he followed up with her regularly to schedule a meeting.

49.    Plaintiff continued to advise Supervisor Mendonca that Defendant Ramphal was singling him out and making it difficult for him to do his job while he is yelling and screaming at him for no reason.

50.    Meanwhile, the hostile work environment grew worse.  Finally, after a year of requesting a meeting, Supervisor Mendonca advised Plaintiff that she was never going to have a meeting with him because it "wasn't going to do any good."  She said that Defendant Ramphal had complaints about Plaintiff as well and that he was going to continue to manage Plaintiff no matter what and that Plaintiff should "figure out" how to get along with him.

**Defendant Ramphal Again Manipulates Overtime in a Racist Manner**

51.    In or about June 2012, Plaintiff discovered that Defendant Ramphal, instead of calling in Plaintiff to fill a "sugar pushing" overtime opportunity before his shift started, had called in another Guyanese employee who was less senior than Plaintiff and who did not know how to perform the sugar pushing position.

52.     In order to deprive the Plaintiff of overtime and to provide the Guyanese employee with overtime, Defendant Ramphal pulled Bobsie off of his regular job and had him perform the sugar push overtime shift at straight time and had the Guyanese employee and a Caucasian employee perform Bobsie's regular shift at an overtime rate.

53.     Plaintiff was shocked by Defendant's blatant manipulation of the system and he asked Defendant Ramphal for an explanation.  Defendant Ramphal told him that he was "not eligible" but could not explain why he was not eligible.

54.     Plaintiff complained to his Union Representative and asked why he never wanted to give overtime to [African-American] workers.  The Union Representative told Plaintiff that he could not have a meeting with Defendant American Sugar but that he would speak to Supervisor Mendonca.

55.     Plaintiff was forced to fight for his overtime for many weeks and was repeatedly told that he was not eligible.   Plaintiff was not allowed to talk to Human Resources about it. Finally, Plaintiff was told that he would be "given" a replacement overtime shift of four hours. Plaintiff would have been assigned the overtime shift that he was allegedly "given" anyway; he did not receive an extra shift.

**Defendant Ramphal Punishes Plaintiff With Grunt Work**

56.     In or about June of 2012, one of the sugar tanks broke and caused a huge sugar spill.  Though sugar spill clean-up jobs were regularly assigned to either an employee in a "relief position" or as overtime, Defendant Ramphal decided to pull Plaintiff off of his regular assignment of running the machine and have Plaintiff perform the clean-up work.  Meanwhile, Defendant Ramphal had the employee in the relief position run Plaintiff's machine.

57.     Because the decision simply did not make sense, Plaintiff asked, "Why are you pulling me off of my job to clean a spill that has nothing to do with me?"  Defendant Ramphal replied, "You're doing it, because I want you to do it."

58.     Plaintiff complained to Supervisor Mendonca and said, "[Defendant Ramphal] is singling me out again. He has pulled me off of my job, and is making me do clean up." Supervisor Mendonca replied that the decision was fine, because Plaintiff "had some responsibility in the spill."

59.     Plaintiff replied that he had no fault in the spill and that he was not present for the spill because he was upstairs running a machine and there was no way for him to know while he was running the machine.

60.     Supervisor Mendonca ignored Plaintiff.  Plaintiff told Supervisor Mendonca that this was another way of Defendant Ramphal harassing him and that he continued to mistreat Plaintiff.  Supervisor Mendonca walked away.

61.     Plaintiff went to Defendant American Sugar's Human Resources Representative Deborah Torche ("HR Rep. Torche) and reported that his problem with Defendant Mehandra was escalating and that Defendant Ramphal continued to harass and badger and mistreat him.

62.     HR Rep. Torche again refused to accept a grievance and told Plaintiff that Defendant Ramphal can assign him any job he wanted, and that he could not submit a grievance unless and until he had a meeting with Supervisor Mendonca. Plaintiff advised HR Rep. Torche that Supervisor Mendonca refused to meet with him. HR Rep. Torche advised him to "keep trying" to talk to her.

63.     Thereafter, Defendant Ramphal continued to verbally abuse and mistreat Plaintiff and show a clear preference for Guyanese employees and blatant disdain for African-American employees.

**Defendant Ramphal Repeatedly Sabotages Plaintiff's Work Equipment**

64.     Part of Plaintiff's job as a remelt operator was to monitor and adjust the machine settings during the remelting process to ensure a certain quality of sugar product.  Plaintiff operated between six and eight machines at a time.

65.     In or about January of 2013, Plaintiff noticed that the sugar coming out of his machines was of a low quality.  Plaintiff started regularly checking and re-checking his settings and he noticed that someone was changing his settings.   Initially the changes were not significant, but as the weeks went on, the changes became more and more significant.

66.     Plaintiff started watching his machine settings more closely, and sure enough, he soon caught Defendant Ramphal changing his machine settings without Plaintiff's knowledge. Plaintiff had never had a supervisor change his machine settings before.  Plaintiff immediately ran out to the machine and noticed that the settings were extremely and obviously off and would produce a bad product.

67.     Plaintiff asked Defendant Ramphal, "Why did you change my machine?  You can't use these settings. The sugar will come out bad."

68.     When Plaintiff attempted to change the machine back, Defendant Ramphal told him that he was not allowed to change the settings and that they were where Defendant Ramphal wanted them.

69.     Defendant Ramphal told Plaintiff that he did not know as much about sugar as Defendant Ramphal because he does not know what he is doing because he is not Guyanese, but

if he was Guyanese he would understand.   He repeatedly told Plaintiff that he knew more about sugar than Plaintiff.

70.    Plaintiff was very concerned because if his machine pushed bad sugar out, it could contaminate the entire refinery and cause a massive shut down.  If Plaintiff was found to be at fault for allowing bad sugar into the rest of the refinery, he could be fired.

71.    Due to the obvious sabotage, Plaintiff started monitoring and testing his sugar far more regularly than required.  It was clear to him that Defendant Ramphal was trying to sabotage his machine and cause him to be terminated.

72.    Plaintiff's sugar product was getting such bad results on Defendant Ramphal's settings that he went to Defendant Ramphal's Supervisor, Joseph Fornabio ("Supervisor Fornabio," and told him, "[Defendant Ramphal] reset my machines, and we are getting bad [sugar] but he won't let me change the settings.  What do you want me to do?"   Supervisor Fornabio told Plaintiff that he absolutely should reset the machine to the proper setting and see if you get a better product.

73.    Soon after, Plaintiff tested the sugar in his machines and realized that the machine was again set to produce bad sugar.  Plaintiff again went to Supervisor Fornabio and told him "I am getting the worst test numbers I have ever seen."   Supervisor Fornabio was shocked and immediately told Plaintiff to shut down the remelt machines and give the bad sugar a chance to leave the system.

74.    Plaintiff was instructed to change the settings and start the machine up again.

75.    Plaintiff reported Defendant Ramphal's sabotage to Supervisor Mendonca but she blew off his concerns and failed to act.

**Defendant Ramphal Starts Performing Plaintiff's Testing**

76.    About a month later, when Plaintiff was preparing to perform the testing, Defendant Ramphal suspiciously pulled him off his machine and told him that he would perform the testing, because he wanted Plaintiff to clean a different area.

77.    When Plaintiff returned, he checked the computer to see if Defendant Ramphal had entered test results, and if so, what the results were.  Sure enough, Defendant Ramphal had entered test results and used Plaintiff's initials as if Plaintiff had done the testing.

78.    Plaintiff did not believe the test results as they were higher than they should have been and asked to retest the sugar. Defendant Ramphal refused to allow him to do so.

79.    Plaintiff told Defendant Ramphal he was not ok with Defendant Ramphal using his initials for test results he did not enter.  Plaintiff said if he was entering test results he should enter his initials.  Defendant Ramphal told Plaintiff he could use Plaintiff's initials anywhere he wanted but that Plaintiff could not change his initials to Defendant Ramphal.

80.    Plaintiff told Supervisor Mendonca about Defendant Ramphal's efforts to sabotage him, but she dismissed his concerns.

**Supervisor Mendonca Calls Plaintiff to her Office and then Writes Him Up**

81.    In or about March of 2013, Supervisor Mendonca called Plaintiff to her office, where she and Defendant Ramphal were waiting.  She advised Plaintiff that Defendant Ramphal had informed her that Plaintiff was not running one of his machines correctly.

82.    Plaintiff was caught off guard and explained that he was operating the machine the way that he had always run the machine and the way that he had been trained to run the machine, and the way that everyone ran the machine.

83.     When the meeting ended and Defendant Ramphal walked out, Plaintiff stated to Supervisor Mendonca, "This is just more of the same with Defendant Ramphal treating me poorly and trying to get me in trouble.  Can we talk about that?"

84.     Supervisor Mendonca replied, "We'll talk about that some other time. We are only here to talk about your performance."

## Supervisor Mendonca Punishes Plaintiff For Attending the Meeting

85.     Outrageously, when he was leaving the meeting, Supervisor Mendonca wrote him up for missing an hour of work while he was attending the meeting that she called him into.  She illogically charged that it was "poor job performance" for him to not have a sugar machine running while he was at the meeting, even though he would not be there to oversee the machine.

## Defendant Ramphal Admits He Is Trying to Get Plaintiff Fired

86.     Plaintiff began hearing rumors that Defendant Ramphal was admitting to people that he was trying to have Plaintiff fired.  Plaintiff himself overheard Defendant Ramphal state that he was trying to get Plaintiff fired.

87.     Plaintiff reported his concerns to his Union Representative, who admitted to Plaintiff that he had heard the same rumors.  Plaintiff told his Union Representative that he could no longer continue to work with Defendant Ramphal and since Defendant American Sugar refused to act, that he was going to have to apply for any other job in order to get away from Defendant Mehandra and the abusive environment.

88.     Plaintiff's Union Representative told him that it was a good idea for him to find a different position.  The Union Representative told him that Defendant American Sugar did not seem to care about the abuse and that there was nothing else he could do about the situation.

**Plaintiff Files a Complaint with the EEOC**

89.     On or about March 14, 2013, Plaintiff filed a complaint with the EEOC about the race and national origin discrimination and retaliation that he endured at the hands of Defendants.

**Plaintiff Takes a Lower Paying Job as a Warehouse Person to Escape Defendant Ramphal's Abuse**

90.     As soon as another job became available, Plaintiff applied for it, even though it paid less and even though he preferred the remelt operator job.

91.     In or about the Spring of 2013, Plaintiff became a Warehouse Person.  He took a pay cut of approximately seventy-five cents an hour.

92.     Plaintiff was initially received with open arms but, upon information and belief, Defendants soon discovered that Plaintiff had filed an EEOC action against Defendants and Plaintiff received cold treatment at his new job as well.

**Defendant American Sugar Punishes Defendant Ramphal when a Caucasian Employee Complains about his Behavior.**

93.     Shortly after Plaintiff filed his EEOC complaint, Supervisor Mendonca made a special trip to come and see him in the warehouse to report to Plaintiff that Defendant Ramphal had been suspended for cursing another worker.  She then asked, "Are you happy now?"

94.     Plaintiff replied, "No, not really, because you would not do anything when it was happening to me."   From then on, Supervisor Mendonca was extremely distant to Plaintiff.

95.     Plaintiff knew that the employee that had complained was Caucasian.  Upon information and belief, Defendant American Sugar takes complaints of Caucasian employees far more seriously than complaints of African-American Employees.

**Plaintiff is Forced Out of Warehouse and into an even lower paying Role**

96.     Thereafter, Plaintiff was treated as a "troublemaker" at the warehouse and constantly subjected to bogus write-ups and harassment.   It was obvious that Defendant American Sugar had informed Plaintiff's Supervisors that he had filed a complaint against the company.   Plaintiff's every move was under scrutiny and his job was constantly threatened.   He was punished for alleged "infractions" which other employees were not confronted about.

**Defendant American Sugar Tries to Make Plaintiff Sign Away his Rights to Object to Any Work related Complaints**

97.     Plaintiff was soon called in to HR Rep. Torche's office who told him that he "should be fired' because his job performance as a Warehouse Person was subpar.

98.     Plaintiff assured HR Torche that the allegations against him were false, but HR Rep. Torche refused to listen.   She insisted that he should be fired, but that she was willing to "allow" him to take a job in maintenance if he signed a letter that he would never file a new grievance or pursue any older grievances ever again.

99.     The Union Vice President was present and immediately objected to the letter, which required Plaintiff to sign away both his Union and legal rights.   He told HR that he could not allow Plaintiff to sign the paper.   HR Rep. Torche repeatedly asked "what part" of the letter Plaintiff objected to.

100.     Finally, upon pressure from the Union, HR Rep. Torche backed off on the letter and the parties agreed that Plaintiff would accept the demotion instead of being fired.

101.     Plaintiff's demotion included a pay cut of more than a dollar, and requires him to perform far more physically taxing work.   Plaintiff enjoys less overtime opportunities, and has suffered a pay cut of approximately 20%.

102.   Upon information and belief, Plaintiff's demotion was made in retaliation for his complaints about race and national origin discrimination.

## AS AND FOR A FIRST CAUSE OF ACTION

103.   Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "102" as if set forth herein.

104.   Plaintiff is an African-American male at all relevant times and is therefore a member of a protected class under 42 U.S.C. §§ 2000 et seq.

105.   Plaintiff was and is qualified to work as an employee for Defendants and he was able to satisfactorily perform the duties required by all positions he has held at Defendant American Sugar.

106.   Defendants subjected Plaintiff to a hostile work environment and an atmosphere of adverse employment actions and decisions because of his race and national origin.

107.   By reason of Defendants' violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary and other benefits associated with his employment.

108.   As a further direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life and the loss of enjoyment of the ordinary pleasures of everyday life.

## AS AND FOR A SECOND CAUSE OF ACTION

109.   Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "108" as if set forth herein.

110.    Plaintiff is an African-American male and is therefore a member of a protected class under the New York State and City Human Rights laws.

111.    Plaintiff was illegally discriminated against because of his race and national origin when Defendants regularly made employment decisions adverse to Plaintiff because of his race and national origin.

112.    The race and national origin discrimination Plaintiff suffered while employed at Defendants was severe and pervasive, unwelcomed by Plaintiff, and would be offensive to a reasonable person.

113.    The race and national origin discrimination that Plaintiff suffered while employed at Defendants severely affected the terms and conditions of his employment, as set forth in detail here and above.

114.    Plaintiff repeatedly reported the discrimination to Defendants' Management Personnel and HR Department and the discrimination was repeatedly witnessed by Defendants' Management Personnel and employees.  Therefore, Defendants knew or should have known about the discrimination and the effect it had on Plaintiff's employment.  Yet, Defendants failed to take the necessary remedial actions.

115.    As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered the indignity of discrimination, the invasion of his rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

116.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful

embarrassment among her family, friends, and co-workers, damage to his good reputation, disruption of his personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

117.    Plaintiff was discriminated against and subjected to race and national origin discrimination that created a hostile work environment by Defendants based on his race, national origin, and skin color in violation of the New York State and City Human Rights Laws.  As a result of Defendants' violation of the New York State Human Rights Law, Plaintiff has been damaged in the sum of no less than $1,000,000.

## AS AND FOR A THIRD CAUSE OF ACTION

118.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "117" as if set forth herein.

119.    Plaintiff became an employee of Defendants in or about 1988 and as such is protected by the New York State and City Human Rights Laws from retaliation and retaliatory demotion.

120.    Plaintiff repeatedly complained to Defendants and/or Defendants' management who regularly witnessed the severe and pervasive race and national origin discrimination and hostile work environment he was subjected to during his employment with Defendants.

121.    Plaintiff's complaints were repeatedly ignored and discouraged by Defendants' managerial and Human Resource employees in violation of New York State and City Human Rights laws as well as, upon information and belief, Defendants' own internal policies and the Union Contract between Defendant American Sugar and its employees.

122.     Plaintiff notified Defendants' Management of the severe race and national origin discrimination and hostile work environment he was subjected to and protested the harassment and the fact that Defendants' Management failed to act responsively.

123.     Plaintiff's protest to Defendants about the severe and pervasive race, national origin, retaliation, and hostile work environment he was subjected to during his employment with Defendants was a protected activity under the New York State and City Human Rights Laws.

124.     Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of race and national origin discrimination and hostile work environment.

125.     Because he protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation throughout the course of his employment.

126.     Because he protested Defendants' unlawful behavior, Plaintiff was demoted, denied promotions, denied overtime opportunities, humiliated, forced to take on extra work and forced to perform significantly unpleasant work that he was not required to do.

127.     The retaliation substantially interfered with the employment of Plaintiff and created an intimidating, offensive, and hostile work environment in violation of Federal Law as well as New York State and City Human Rights Laws.

127.     Defendants knew or should have known about the retaliation and the effect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct, and in fact allowed Plaintiff to suffer retaliatory demotions.

128.     As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose

substantial income including, but not limited to wages, social security, and other benefits due him.

129.    Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of his rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

130.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

131.    Plaintiff was discriminated and retaliated against and suffered a retaliation in violation of Federal Law as well as New York State and City Human Rights Law. As a result of Defendants' violation of Federal law, New York State and New York City Human Rights Law, Plaintiff has been damaged in the sum of no less than $1,000,000.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

(i)    On the First Cause of Action, awarding Plaintiff compensatory and other damages including punitive damages in an amount to be determined at trial but in any case no less than $1,000,000;

(ii)    On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial but in any case no less than $1,000,000;

(iii)   On the Third Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial but in any case no less than $1,000,000;

(iv)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

**Dated: New York, New York**
       **September 30, 2014**

                             **NESENOFF & MILTENBERG, LLP**
                             *Attorneys for Plaintiff*

                             **By:**           **/S/**
                                 **Megan S. Goddard, Esq.**
                                 **363 Seventh Avenue, Fifth Floor**
                                 **New York, New York 10001**
                                 **(212) 736-4500**

**TO:**   **Michael Thomas Hensley**
       **Bressler, Amery & Ross, P.C. (NJ)**
       **325 Columbia Turnpike, Suite 301**
       **Florham Park, New Jersey 07932**
       **(973)-514-1200 (phone)**
       **(973)-514-1660 (fax)**
       **mhensley@bressler.com**