**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CLAUDE N. LEWIS,

             Plaintiff,

    v.

AMERICAN SUGAR REFINING, INC. and
MEHANDRA RAMPHAL,

          Defendants.

Index No. 14-cv-02302 (CRK)[1]
ECF Case

---

## MEMORANDUM AND ORDER

Before the court are American Sugar Refining, Inc. ("ASR") and Mehandra Ramphal's ("Ramphal") (collectively "Defendants") post-trial motions for judgment as a matter of law, or in the alternative, a new trial or remittitur. See Mem. L. Supp. Defs.' [ASR] & [Ramphal]'s Renewed Mot. J. Matter of Law, or Alt., Mot. New Trial, or Alt., Mot. Remit Damages, May 18, 2018, ECF No. 190 ("Defs.' Post-Trial Br."); Notice of Mots. J. Matter of Law Pursuant to Fed. R. Civ. P. 50, or Alt. New Trial Pursuant to Fed. R. Civ. P. 59 or Remittitur, May 21, 2018, ECF No. 191. For the reasons that follow, Defendants' post-trial motions for a new trial, judgment as a matter of law, and remittitur of the jury's actual and punitive damages awards are denied. The court grants Defendants' post-trial motion to remit the jury's compensatory damages award.

Claude N. Lewis ("Plaintiff") brought this action against his employer, ASR, and his supervisor, Ramphal, alleging race and national origin discrimination, hostile work environment, and retaliation by Defendants in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),

---

[1] Judge Claire R. Kelly of the United States Court of International Trade, sitting by designation.

the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law. See Compl., Mar. 27, 2014, ECF No. 2; Am. Compl., Sept. 30, 2014, ECF No. 24. Jury selection in this action occurred on April 17, 2018, and a jury trial on this matter was held from April 18, 2018 until April 23, 2018. See Trial Trs., (Apr. 18–23, 2018), ECF Nos. 179–88. After Plaintiff presented his case and rested, Defendants' counsel moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, alleging that Plaintiff failed to present sufficient evidence to maintain his punitive damages claim, see Trial Tr. at 912:5–914:19, (Apr. 23, 2018), ECF No. 187 ("Apr. 23 Trial Tr."), his actual damages claim arising from alleged loss of overtime pay, see id. at 914:20–916:14, his state and federal disparate treatment claims, see id. at 916:15–919:18, and his federal and state hostile work environment claims. See id. at 919:19–921:5. Plaintiff's counsel had the opportunity to respond, explaining that Plaintiff presented adequate evidence on all counts, and requesting that the court reserve judgment on Defendants' Rule 50(a) motion and defer its ruling until after the verdict was rendered. See id. at 921:10–924:25. The court reserved ruling on Defendants' Rule 50(a) motion. Id. at 925:5–8. The jury returned a verdict for Plaintiff in the amounts of $104,000 in actual damages, $250,000 in compensatory damages, and $2,000,000 in punitive damages. Id. at 1082:13–1086:9; Verdict Form at 3–4, Apr. 24, 2018, ECF No. 166. On May 3, 2018, the court granted the parties' consent motion to delay the entry of judgment until the disposition of all post-trial motions. See [Ct. Endorsed] Consent Mot. Delay Entry J., May 3, 2018, ECF No. 172.

## DISCUSSION

### I. DEFENDANTS' RULE 59 MOTION FOR NEW TRIAL

Defendants request the court to order a new trial pursuant to Fed. R. Civ. P. 59(a). See Defs.' Post-Trial Br. at 3–22. Specifically, Defendants contend that: 1) the jury was tainted by

empaneled Juror 5 who did not disclose his alleged anti-corporate bias which, if disclosed, would have demonstrated that he could not be impartial; 2) the court erred by failing to dismiss for cause Prospective Juror 27, who Defendants allege was openly biased, causing Defendants to use a peremptory challenge to remove this prospective juror; 3) the court erred by permitting Plaintiff's counsel to introduce evidence of Defendant ASR's financial status, relevant only to punitive damages, throughout the trial; 4) the jury erred in its credibility determinations; 5) the court erred by permitting certain testimony from Plaintiff's witnesses Fred Gaffney ("Gaffney") and Darius Schullere ("Schullere"); and 6) because the jury's verdict is excessive. Id. For the reasons that follow, the court denies Defendants' post-trial motion for a new trial.

### A.  Legal Standard

Rule 59(a) of the Federal Rules of Civil Procedure governs motions for a new trial following a jury trial. Fed. R. Civ. P. 59(a). Pursuant to Rule 59(a), "[t]he court may, on motion, grant a new trial on all or some of the issues--and to any party-- . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). "Unlike [a Rule 50 motion for] judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998); Bevevino v. Saydjari, 574 F.2d 676, 683 (2d Cir. 1978). Although the trial judge possesses "large" authority to grant or deny Rule 59(a) motions, Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 432–33 (1996), the "court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 370 (2d Cir. 1988) (citing Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir. 1983)); see Bevevino, 574 F.2d at 684; DLC Management Corp., 163 F.3d at 134 ("A court considering a Rule

59 motion for a new trial must bear in mind . . . that the court should only grant such a motion

when the jury's verdict is egregious." (quotations and citation omitted)).  Courts have determined

that

> [t]he circumstances ordinarily recognized as supporting a new trial are that the jury
> has reached a "seriously erroneous result" or that the verdict is a "miscarriage of
> justice," i.e., that the verdict is against the weight of the evidence, that the damages
> awarded were excessive, or that for stated reasons the trial was not fair to the
> moving party.

Mallis, 717 F.2d at 691 (citation omitted) (citing Montgomery Ward & Co. v. Duncan, 311 U.S.

243, 251 (1940); 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE §§ 2805–10,

at 37–77 (1973)).

### B.  The Alleged Undisclosed Anti-Corporate Bias of Juror 5

Defendants argue that the jury was tainted and the trial rendered unfair because Juror 5

failed to disclose his alleged anti-corporate bias, which if disclosed would have demonstrated that

he could not be fair and impartial.  See Defs.' Post-Trial Br. at 4–7.  Plaintiff replies that

Defendants' challenge is baseless because Juror 5 unequivocally asserted during voir dire that he

could be fair and impartial, and that Juror 5's utterances on social media regarding the role and

power of corporations in the United States, discovered post-trial, do not demonstrate his inability

to be so or an intent to mislead the court and counsel.  See Pl.'s Mem. Law Opp'n Defs.' Mot.

New Trial & J. Matter of Law at 47–48, June 22, 2018, ECF No. 198 ("Pl.'s Resp. Br.").  For the

reasons that follow, Defendants' arguments are unpersuasive and the court will not order a new

trial based on this ground.

The court engages in a two-part inquiry to determine whether a new trial is warranted as a

result of purported juror misstatements or nondisclosure.  See McDonough Power Equip., Inc. v.

Greenwood, 464 U.S. 548, 556 (1984).  The court will order a new trial if it determines that a juror

both failed to "answer honestly a material question on voir dire" and "that a correct response would have provided a valid basis for a challenge for cause." Id. Further, a district court has "broad flexibility" in investigating allegations of juror bias or misconduct when the conduct relates to a juror's own statements. United States v. Peterson, 385 F.3d 127, 134 (2d Cir. 2004) (quoting United States v. Cox, 324 F.3d 77, 86 (2d Cir. 2003)).

During voir dire, the court and the parties' counsel reviewed each prospective juror's questionnaire, and the court questioned at sidebar each prospective juror who raised a concern among the court or counsel as to that prospective juror's ability to be objective and fair.[2] After questioning each prospective juror in this way, the court and counsel discussed any remaining concerns as to that prospective juror's ability to be fair in this case, and the court struck for cause all prospective jurors who the court determined could not be fair. At the request of Defendants' counsel, the court questioned Juror 5 (then-Prospective Juror 28) about an answer he provided on his questionnaire that he previously sought the help of a supervisor or his union for a dispute in the workplace:

> [Defendants' counsel]: I just had a quick question for him, because he said he sought [help] from his [union] and his supervisor, I'm just curious as to what was the nature of that help and why.
>
> [Prospective Juror 28 was brought up to sidebar.]
>
> [. . .]
>
> THE COURT: I just wanted to ask you a follow-up, a couple of questions here. When we asked have you ever or any member of your immediate family, etc., sought help with a supervisor regarding a dispute, then here with a union same thing you had answered yes. Could you just tell us more about those?

---

[2] The court utilized a dual questionnaire system during voir dire. The two questionnaires were created using questions submitted by the parties. The parties' counsel reviewed the two questionnaires prior to voir dire, raised objections, and after several rounds of discussions agreed on the final versions of the questionnaires that were presented to the prospective juror pool. See Voir Dire Tr. at 6:6–19:25.

| | |
|---|---|
| JUROR: | I am on the executive board of my union. I act as a shop steward often. I have been there a long time, and often grabbed both by union and management to intervene if there is interpersonal problems, in addition to just the contractual things I have to do. |
| THE COURT: | So really as part of your job, it wasn't anything personal as to you. |
| JUROR: | Oh, right. Yeah, yeah. Not to me, just acting as a rep. |
| THE COURT: | And do you think that you can put your experience as a union rep out of your head and be fair? |
| JUROR: | I have learned that there is always more than two sides to the story. Things are never black and white, and, yeah, I think I can. |
| THE COURT: | All right. Thank you very much. |

[Prospective Juror 28 was excused from sidebar.]

[Defendants' counsel]: No objection.

| | |
|---|---|
| THE COURT: | I don't have an objection. |

[Plaintiff's counsel]:   No objection.

Voir Dire Tr. at 116:18–117:25.  The court and the parties were thus made aware that Prospective Juror 28 was not just a union member, but was in fact a union representative.  It would not be unreasonable to expect that someone who is a union representative might have sympathies that were pro-worker and even anti-corporation.  The court specifically asked the prospective juror whether he could "put [his] experience as a union rep out of [his] head and be fair." Id. at 117:17–18.  He answered that he could.  Id. at 117:19–21.  As the transcript reflects, following this questioning, counsel for both parties affirmatively stated that they had no objection to this prospective juror.  See id. at 117:23–25.

The allegations of this juror's alleged anti-corporate bias do not warrant a new trial. Defendants assert that this juror was lying during voir dire when he said he could be fair, given the later discovered information, and the fact that in an earlier section of the questionnaire asking prospective jurors whether they would be able to treat corporations with the same level of fairness as individuals, Prospective Juror 28 indicated that he could.  See Defs.' Post-Trial Br. at 4–5 (referring to Questions 18–21 of the court's second voir dire questionnaire, and reproducing Question 18); see also Voir Dire Tr. at 52:17–53:1.  Defendants argue that the court should infer from this juror's social media comments on unrelated matters that he lied to the court regarding his ability to be fair towards corporate parties.  See Defs.' Post-Trial Br. at 5–7.  The court does not find this juror's social media posts to evidence that he lied during voir dire.[3]

---

[3] Defendants argue that Prospective Juror 28 made a material omission that, if disclosed, would have resulted in the juror being struck for cause, and that case law supports the ordering of a new trial.  See Reply Mem. Law Further Supp. Defs. [ASR] & [Ramphal]'s Renewed Mot. J. Matter of Law, or Alt., Mot. New Trial, or Alt., Mot. Remit Damages at 3–6, July 6, 2018, ECF No. 203 ("Defs.' Reply Br.").  However, in the present case, there is no evidence that Prospective Juror 28 deliberately omitted information when answering the questionnaire or conversing with the court at sidebar.  Further, the cases Defendants rely upon did not order a new trial because of juror misconduct or bias.  For example, in Colombo, an empaneled juror falsely answered a question during voir dire regarding whether she knew or was related to anyone who was an attorney and the court remanded for an evidentiary hearing to determine whether the juror's brother-in-law was in fact an attorney.  See United States v. Colombo, 869 F.2d 149, 152 (2d Cir. 1989).  Ultimately, however, the court determined that because the brother-in-law had not practiced law for over 30 years, the juror's failure was not intentional.  See United States v. Colombo, 909 F.2d 711, 713 (2d Cir. 1990).  Defendants' reliance on Heller is likewise unpersuasive because in that case empaneled jurors used racial and anti-Semitic slurs during deliberations.  See United States v. Heller, 785 F.2d 1524, 1526–28 (11th Cir. 1986).  Finally, Kuzdzal is inapplicable because that is a state court of appeals case applying a state-provided test for evaluating juror misconduct.  See People v. Kuzdzal, No. 48, 2018 WL 2105673, at *2–4 (N.Y. May 8, 2018).  There are also serious policy concerns regarding the appropriateness of counsel delving into jurors' social media accounts, after the conclusion of trial, to potentially uncover juror statements made out of court and unrelated to the proceedings, and use any discovered statements as evidence of purported juror bias or inability to be fair.  Such a practice may decrease willingness to serve on juries or dampen private citizens' ability to engage in civil discourse.  Defendants contend that under "appropriate circumstances," such as the ones that transpired here, a juror's social media activities can "form the basis for a new trial."  Defs.' Post-Trial Br. at 4 (citing United States v. Fumo, 655 F.3d 288, 298 (3d Cir. 2011), as amended (Sept. 15, 2011)).  However, the Fumo court did not order a new trial and noted that although trial courts should provide for, in their jury instructions, language discouraging jurors from "commenting—even obliquely—about a trial on social media networking websites and other internet mediums," failure to do so will not automatically result in a new trial, but instead prompt the court to

The ability to be objective and fair does not require the absence of personal views outside of the case. The jury is asked to listen to the evidence presented objectively, weigh the credibility of witnesses and testimony, and assess the case based on what they hear and see in the courtroom. Jurors may and can have personal views on certain issues, but in evaluating the potential for juror bias and impartiality during voir dire, the relevant inquiry is whether a juror can set those views aside to assess the case based only on the evidence presented. The court questioned Prospective Juror 28, asking him if he could be fair and put his role as a union member and representative out of his mind. See Voir Dire Tr. at 117:17–18. He answered under oath that he could. Id. at 117:19–21.

### C. Prospective Juror 27

Defendants argue that the court erred by not dismissing Prospective Juror 27 for cause. See Defs.' Post-Trial Br. at 7–10. Plaintiff argues that Prospective Juror 27 informed the court that he could be fair and impartial and that relevant precedent implies that loss of a peremptory challenge does not constitute an injury.[4] See Pl.'s Resp. Br. at 48. For the reasons that follow, Defendants' arguments are unpersuasive and the court will not order a new trial based on this ground.

To "determine whether bias [is] sufficient to warrant a challenge for cause," the court must ask whether there are "any facts in the case suggesting that bias should be conclusively presumed; and if not, [whether] it is more probable than not that the juror was actually biased against the litigant." Bainlardi v. SBC Warburg, Inc., No. 97 Civ. 2861(KTD)(HBP), 1998 WL 872487, at

---

evaluate the prejudicial effect. Fumo, 655 F.3d at 305. The facts here do not demonstrate that Defendants were prejudiced.

[4] Plaintiff also argues that by not objecting to Prospective Juror 27 for cause during voir dire, Defendants waived their challenge. See Pl.'s Resp. Br. at 48. Plaintiff's argument fails because Defendants' counsel did object to Prospective Juror 27 at voir dire. See Voir Dire Tr. at 115:5–18.

*3 (S.D.N.Y. Dec. 14, 1998) (quoting Green v. Vacco, 961 F. Supp. 46, 50 (W.D.N.Y. 1997)).

Such a determination is within the province of the trial judge, as it requires consideration of the

credibility and demeanor of the juror in order to ascertain whether or not he or she will act with

impartiality.  See United States v. Nelson, 277 F.3d 164, 201–02 (2d Cir. 2002).  In the criminal

law context, a party's use of peremptory challenge to remove a juror that should have been struck

by the court will not give rise to a claim, post-trial, unless the party foregoes using their peremptory

strike and the juror actually sits on the jury.  See United States v. Martinez-Salazar, 528 U.S. 304,

315–16 (2000).  The United States Court of Appeals for the Second Circuit has not opined on

whether the result is the same in the civil context, but did note, in dicta, that the rule should be the

same across the criminal and civil contexts.  See Cruz v. Jordan, 357 F.3d 269, 271 (2d Cir. 2004).

Finally, "[a] district court's findings concerning actual bias are 'based upon determinations of

demeanor and credibility that are peculiarly within a trial judge's province.'"  Nelson, 277 F.3d at

201 (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)).

Defendants allege that Prospective Juror 27 was openly biased because, "[o]nly after being

asked several times by the Court whether he could be impartial (suggesting that impartiality was

the correct response) did Prospective Juror 27 respond affirmatively that he could try to ignore his

bias."  Defs.' Post-Trial Br. at 9.  Defendants contend that Prospective Juror 27 did not provide an

unambiguous statement that he could be unbiased.  Id.  When evaluating the responses offered by

Prospective Juror 27, the court asked that juror whether he would be able to put his experiences

out of his mind and "listen to the facts and the law," as the court instructs.  See Voir Dire Tr. at

113:25–114:22.  Prospective Juror 27 explicitly stated that "[i]t shouldn't be that difficult."  Id. at

114:23.[5]  The court found his response to be unambiguous based upon the words used, his tone

---

[5] Defendants argue that the court's failure to dismiss Prospective Juror 27 for cause forced them to use a peremptory strike to remove Prospective Juror 27, resulting in an impartial jury as it included Juror 5 (then-

and his body language. Moreover, and as the court emphasized during voir dire, the relevant inquiry is not whether a prospective juror has ever had certain experiences in the workplace, but rather whether that prospective juror will be able to put any relevant experiences out of his or her mind and hear the facts of the case objectively.[6] See, e.g., Voir Dire Tr. at 104:7–11, 108:4–8.

### D. The Introduction of Information Related to ASR's Financial Status

Defendants allege that the trial was tainted by Plaintiff's counsel's introduction of evidence related to ASR's financial status, relevant only to punitive damages, throughout the trial. See Defs.' Post-Trial Br. at 11–13. For the reasons that follow, Defendants' arguments are unpersuasive and the court will not order a new trial based on this ground.

The court addressed and denied, pre-trial, Defendants' motion to bifurcate damages, reasoning that bifurcation would neither economize nor expedite the proceedings, would be inconvenient, and that any potential for prejudice could be rectified with a limiting instruction. Mem. & Order at 4–5, Mar. 27, 2018, ECF No. 148. The decision to bifurcate is in the discretion of the trial court, Katsaros v. Cody, 744 F.2d 270, 278 (2d Cir. 1984), and its decision is dependent

---

Prospective Juror 28), who Defendants allege possessed an undisclosed anti-corporate bias. See Defs.' Post-Trial Br. at 10. This argument is untenable as it assumes a causal connection between the use of a peremptory strike on Prospective Juror 27 and the empaneling of Juror 5. Defendants' position implies that the jury would not have included Juror 5, if Prospective Juror 27 had been struck for cause. However, Defendants did not raise any objection to Juror 5 during voir dire and, and by Defendants' own admission, the alleged bias of Juror 5 was not discovered until after the conclusion of trial. See Defs.' Post-Trial Br. at 5–6, 5 n.1. The court will not speculate as to Defendants' peremptory strike strategy.

[6] By contrast, during voir dire, the court questioned and ultimately removed several prospective jurors for cause who the court perceived could not be unbiased, applying the same analysis. See, e.g., Voir Dire Tr. at 66:10–17, 73:24–76:16, 81:7–82:14, 85:2–86:20, 101:18–108:11. The court determined that at least three prospective jurors, to whom Defendants' counsel objected to on grounds of bias, might not be able to be fair and removed those prospective jurors for cause. See, e.g., Voir Dire Tr. at 66:10–17, 81:7–82:14, 101:18–108:11. For example, Prospective Juror 24 was removed for cause because the court determined, over the objections of Plaintiff's counsel, that this prospective juror was unable to set prior experiences of workplace retaliation aside and be unbiased. See Voir Dire Tr. at 101:18–108:11.

on the unique facts and circumstances of the case and there is no "bright-line test[.]"  Monaghan v. SZS 33 Assocs., L.P., 827 F. Supp. 233, 245 (S.D.N.Y. 1993) (citation omitted).

Contrary to Defendants' claims, see Defs.' Post-Trial Br. at 12–13, Defendants were neither prejudiced by Plaintiff's counsel's characterization of certain workers at Defendant ASR's Yonkers plant as "blue-collar workers," nor by the few references Plaintiff's counsel made to Defendant ASR's corporate size, and sales volume and operations.  This was a four-day trial, and Plaintiff's counsel's characterizations of ASR's workers and references to the scope and operations of Defendant ASR were limited in nature.  Further, even if there was any risk of prejudice, the court's limiting instruction and jury charge would have cured it.  See Zafiro v. United States, 506 U.S. 534, 539 (1993) (the trial court retains discretion to tailor relief from potential prejudice); [Corrected] Tr. at 11:10–20, (Apr. 18, 2018), ECF No. 179 ("Apr. 18 Trial Tr."); Apr. 23 Trial Tr. at 1064:2–1066:3.

### E.   The Jury's Credibility Determinations

Defendants argue that the jury reached a seriously erroneous result finding for Plaintiff because Plaintiff did not demonstrate that Defendants discriminated against him on the basis of his race and/or national origin, perpetuated a hostile work environment, or retaliated against him for filing a complaint with the United States Equal Employment and Opportunity Commission ("EEOC") and initiating this litigation.  See Defs.' Post-Trial Br. at 13–20.  Defendants argue that four aspects of Plaintiff's trial testimony demonstrate Plaintiff's incredibility: 1) Plaintiff's claim that Defendant Ramphal "simultaneously" berated and cursed at him in private and in public; 2) Plaintiff's testimony that he was a "model employee," in light of impeachment evidence that he was issued various disciplinary notices; 3) Plaintiff's testimony that when Defendant Ramphal allegedly used the phrase "you people" he meant the "n word," in light of Plaintiff's failure to

assert that equivalence in his EEOC Intake Questionnaire; and 4) Plaintiff's testimony at trial that he specifically used the word "discrimination" in conversations with ASR employees and witnesses Elizabeth Mendonca ("Mendonca") and Debra Troche ("Troche"),[7] which conflicts with the trial testimony of Mendonca and Troche and was not alleged by Plaintiff at his deposition, complaint, or in any other documents filed in the case.  Id. at 14–16 (citations omitted).  Plaintiff responds that the returned verdict was not against the weight of the evidence and that all of Defendants' challenges are properly left to the jury's determination.  Pl.'s Resp. Br. at 46–47.  For the reasons that follow, Defendants' arguments are unpersuasive and the court will not order a new trial based on these grounds.

Although a district court may, on a motion for a new trial challenging the verdict as against the weight of the evidence, weigh the evidence to determine whether the verdict goes against it, "a court should rarely disturb a jury's evaluation of a witness's credibility."  DLC Management Corp., 163 F.3d. at 133–34 (citing Dunlap-McCuller v. Riese Org., 980 F.2d 153, 158 (2d Cir. 1992); Metromedia Co. v. Fugazy, 983 F.2d 350, 363 (2d Cir. 1992)).  "[A] trial judge can never substitute its view of the evidence for that of the jury, [unless] the judge is 'convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"  See United States v. Landau, 155 F.3d 93, 105–06 (2d Cir. 1998) (quoting Lightning Bolt Prods., Inc., 861 F.2d at 370).

Here, sufficient evidence exists such that the jury could conclude that Plaintiff's testimony was credible.  Defendants argue that Plaintiff's testimony that he was both privately and publically discriminated against and harassed by Defendant Ramphal is incredible.  Defs.' Post-Trial Br. at

---

[7] Witness Debra Troche is also referred to in the trial transcripts and in documents filed with the court as Debbie Troche and as Debra or Debbie Lafaro.  See, e.g., Apr. 18 Trial Tr. at 152:11–22, 249:16; Apr. 23 Trial Tr. at 922:7.

14–15.  Defendants' counsel questioned Plaintiff on this issue, and the jurors heard Plaintiff's

responses to Defendants' counsel's questioning[8] and Plaintiff's own testimony on the matter.[9]

---

[8] On cross-examination and in an attempt to undercut Plaintiff's credibility, Defendants' counsel questioned Plaintiff regarding his allegation that Defendant Ramphal berated and cursed at him both in private and in public:

> Q. Now, after you change and became a remelt operator, [Defendant] Ramphal became one of your supervisors, right?
>
> A. Yes.
>
> Q. And during your direct testimony you accuse [Defendant] Ramphal of making certain derogatory comments to you?
>
> A. Yes.
>
> Q. We can agree, sir, that you don't have a single eyewitness to corroborate any of those claims, true?
>
> A. No, true.
>
> Q. And you also testified on direct that [Defendant] Ramphal would go to your office and talk poorly to you so that no one could hear, right?
>
> A. Yes.
>
> Q. But you also testified that [Defendant] Ramphal would talk poorly to you on the walkie-talkie and everyone could hear, right?
>
> A. Yes.
>
> Q. So which is it, [Plaintiff] Lewis, was he trying to conceal his discriminatory behavior or broadcast it for all the world to see?
>
> A. There wasn't really any cursing, just a command to be somewhere. It wasn't really the cursing that he had given me when he was in the office.

Apr. 20 Trial Tr. at 781:19–782:15.

[9] For example, the jury heard Plaintiff's testimony that he felt publically humiliated when Defendant Ramphal called for him over the walkie-talkie system at inappropriate times:

> Q. Would he also use the walkie-talkie at any other time or just before your shift?
>
> A. No. Sometimes even when -- he constantly was looking for me and said that he wanted to know where I was, whether I was in the bathroom, on break, and it just made it sound like he was -- I was never where I was supposed to be, I was never doing what I was supposed to do.
>
> Q. Is that true?
>
> A. No. I was always doing my job.
>
> Q. So how did it make you feel when he spoke to you like that over the walkie-talkies?

Plaintiff's claims of being cursed at and berated by Defendant Ramphal in both private and public are not inconsistent or mutually exclusive, and given the testimony provided at trial contextualizing why Defendant Ramphal's behavior was discriminatory, see, e.g., Trial Tr. at 347:12–348:7, 348:21–349:10 (Apr. 19, 2018), ECF No. 181 ("Apr. 19 Trial Tr."), it was not unreasonable for the jury to find Plaintiff's testimony credible.  It was also not unreasonable for the jury to credit Plaintiff's testimony despite evidence that Plaintiff was disciplined over the course of his approximately 30-year employment history with ASR.  Further, Plaintiff did not characterize himself as a "model employee," as Defendants state.  See Defs.' Post-Trial Br. at 15.  Instead, Plaintiff indicated that, in 2013, he had no previous major disciplinary history in the course of his then approximately 25-year employment with the company.  See Apr. 19 Trial Tr. at 440:5–22.  On cross-examination, Defendants' counsel questioned Plaintiff regarding four disciplinary notices that he received.  See Trial Tr. at 719:14–724:25, (Apr. 20, 2018), ECF No. 185 ("Apr. 20

---

A. It felt very degraded, very demeaning, very upset. It was getting me very distraught that I was being badgered all the time, whether it was in the office or on the walkie-talkie, and it was just hard for me to take.

Trial Tr. at 352:6–20, (Apr. 19, 2018), ECF No. 181.  The jury also heard Plaintiff's testimony that Defendant Ramphal privately yelled at him:

Q. And who else was around when [Defendant] Ramphal came to your station?

A. Generally nobody, nobody at all.

[. . .]

Q. Were you allowed to ask [Defendant] Ramphal questions?

A. Yes, but he often didn't really respond when I asked him.

Q. What would he do when you asked him questions?

A. Often at times when he asked me questions, he got very -- he started cursing and yelling and screaming at me. He would say things, I mean, excuse my language, but he would tell me to shut the fuck up and tell me that I should -- I should know. You people need to know what you are doing. You people need to start getting your act together. It was just a lot of cursing and yelling and screaming.

Apr. 19 Trial Tr. at 347:3–19.

Trial Tr.").[10]  The jury heard that these disciplinary notices showed that Plaintiff had in fact been

disciplined for not running a machine properly and that Plaintiff had previously been on the last

step of the progressive discipline system.  The jury was free to decide whether Defendants' cross-

examination, revealing past disciplinary issues, undercut Plaintiff's testimony regarding his

allegations of discrimination, hostile work environment, and retaliation against Defendants.

Plaintiff testified for a day and a half concerning his work history at ASR, his numerous positions

and job responsibilities, and numerous encounters with multiple people at ASR over a period of

over thirty years.  Impeachment evidence is used to attack a witness's credibility or character for

truthfulness.  See Fed. R. Evid. 608.  However, it is up to the jury to determine whether a given

attempt at impeachment was successful and value the impact the information revealed had on a

witness' credibility.  See Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 35 (1944) ("it is the jury,

not the court which . . . judges the credibility of witnesses"); Wade v. Orange County Sheriff's

Office, 844 F.2d 951, 955 (2d Cir. 1988).  The court cannot say that it was unreasonable, given the

breadth and detail of Plaintiff's testimony, for the jury to determine that Defendants' introduction

of the prior disciplinary notices did not impeach Plaintiff's credibility.

   Further, the fact that Plaintiff did not explicitly state in his EEOC Intake Questionnaire that

he believed that "Ramphal's alleged use of 'you people' was the equivalent of the 'n word,'" see

Defs.' Post-Trial Br. at 15 (citation omitted), does not undermine the jury's credibility

---

[10] The court cites to the uncorrected April 20, 2018 trial transcript because the corrected version, published
at ECF No. 183, omits a large number of pages from the cross-examination of Plaintiff.  The court cites to
some of these omitted pages.  By contrast, the uncorrected version provides Plaintiff's cross-examination
in full.  The error in the uncorrected version is that it is mis-numbered and there are two page 611s.  This
memorandum and order cites to page 611 or to a range that encompasses that page on several occasions,
and for ease of reference accompanies each cite with a parenthetical explanation of which page 611 is cited.

determinations.[11]   The jury heard that Plaintiff completed the EEOC Intake Questionnaire in a

hurry, and that he left some answer fields incomplete under the belief that he would be "able to

speak with someone later" and be able return to the form to thoroughly explain and add to his

allegations.   See Apr. 20 Trial Tr. at 758:2–10, 767:9–11.   During trial, the jury also heard

Plaintiff's testimony of how he formed the belief that the use of the phrase "you people" by

Defendant Ramphal was the equivalent of using the "n word."   See Apr. 19 Trial Tr. at 347:13–

350:21, 353:2–8, 356:6–359:9, 361:13–20, 366:9–17.   The jury also heard testimony that the

EEOC Questionnaire Intake form included a statement by Plaintiff which indicated that he was

discriminated against on the basis of his race and/or national origin.[12]   Accordingly, the jury could

---

[11] Indeed, the jury heard Plaintiff testify regarding his understanding of what Defendant Ramphal meant when he said "you people," Defendant Ramphal's tone, and the context in which the phrase was used.   See

Apr. 19 Trial Tr. at 348:21–349:23.   Specifically, Plaintiff explained:

> Q. How did it make you feel when [Defendant] Ramphal used the phrase "you people" with you?
>
> A. I felt as if he was talking to me like he's using the N word often, and he would make derogatory statements about being stupid also using the N word -- not using the N word but saying "you people," and I sort of thought of that as being the same thing.

Id. at 353:2–8.   The court cannot say that it was unreasonable for the jury to find Plaintiff's testimony credible.

[12] Specifically, the jury heard Plaintiff's testimony on direct examination that he indicated on his EEOC Intake Questionnaire that he was experiencing "national origin and retaliation" and wrote down "Guyanese to African-American," by which he meant discrimination:

> Q. OK. And can you read to us what you wrote there?
>
> A. "Guyanese to African-American."
>
> Q. And what does that mean?
>
> A. I think there was discrimination of some Guyanese to African-American -- someone African-American.
>
> [ . . . ]
>
> Q. Did you have a lawyer when you went to the EEOC?
>
> A. No, I didn't.
>
> Q. How much time did you spend filling out this form?
>
> A. I think it may have been about 20 minutes.

reasonably have determined that although Plaintiff did not submit the most complete Intake Questionnaire to the EEOC, Plaintiff believed that he was being discriminated against by the Defendants and filled out the form with the intent of seeking resolution of that issue.

Finally, the jury heard conflicting testimony regarding whether Plaintiff used the word "discrimination" in conversations with Mendonca and Troche.  Compare Apr. 19 Trial Tr. at 359:22–360:3, 364:16–22, with Apr. 18 Trial Tr. at 110:22–111:3, 112:14–21, 126:21–127:4, 182:22–183:16.  The jury is charged with weighing conflicting testimony, and a district court should not grant a new trial on the basis that there is conflicting testimony going to credibility.  See Sorlucco v. New York City Police Dep't, 971 F.2d 864, 875 (2d Cir. 1992).  The fact that Plaintiff's testimony on this issue was in conflict with the testimony of two of Defendants' witnesses does not render Plaintiff's testimony incredible.  It is the province of the jury to weigh the conflicting testimony to determine which side is credible.  The jurors did so here, and found Plaintiff's testimony credible.  Defendants further emphasize that Plaintiff did not previously claim that he used the word "discrimination" in his conversations with Mendonca or Troche.  See Defs.' Post-Trial Br. at 15–16.  However, as Defendants note, Plaintiff did previously indicate that he "spoke to Troche and Mendonca about Ramphal singling him out and badgering him[.]"  Id. at 16.  Therefore, the jury could have reasonably determined that Troche and Mendonca were on notice of Plaintiff's discrimination claim.  Further, to the extent that Defendants insinuate that Plaintiff's

---

Q. Did anyone help you fill the form out at the EEOC?

A. No.

Apr. 19 Trial Tr. at 447:7–447:11, 449:2–7.  The jury could have reasonably concluded from this exchange that Plaintiff's answer of "Guyanese to African-American" as the basis for his race and/or national origin discrimination claim indicated that Plaintiff believed he was being discriminated against, that Plaintiff was trying to get aid in stopping the discriminatory treatment, and that in his hurry, he did not provide the complete history of grievances or instances of prior treatment by Defendant Ramphal that formed the basis of Plaintiff's claim of race and/or national origin discrimination claim.

testimony at trial that he explicitly used the word "discrimination" when reporting Defendant Ramphal's behavior to Mendonca and Troche was not truthful, Defendants' counsel questioned Plaintiff on this point during cross-examination.  See Apr. 20 Trial Tr. at 754:25–755:24, 794:4– 14.  The jury heard the conflicting testimony of Plaintiff, Mendonca, and Troche, and given the verdict, seemingly credited Plaintiff's narrative that he used the word "discrimination" in those conversations.  The court does not find any reason to disturb that credibility determination.

Defendants' challenges highlight the fact that this case turned on the credibility of Plaintiff, as compared to the credibility of his supervisor, Defendant Ramphal and Defendant ASR's managerial staff.  That is, the jury was asked to determine who was credible—Plaintiff who alleged discrimination, loss of overtime and demotion as a result of complaining of the discrimination he experienced, and further subjection to a hostile work environment, or Defendants, who claimed that Plaintiff never reported the allegedly discriminatory acts and that if he had, the company would have responded, and that Plaintiff was disciplined and demoted because of his skill.  Much of the evidence at trial, and as made clear by the types of challenges raised by Defendants in their motion for a new trial, went to the parties' credibility or circumstantial evidence purporting to reveal a party's motivation for a given act.  It was not unreasonable, based on the witness testimony and evidence presented, for the jury to find Plaintiff credible and to issue the verdict that it did.  The court cannot say that the jury's verdict is seriously erroneous or against the weight of the evidence.

Defendants' arguments that Defendants had legitimate, non-discriminatory reasons for their conduct and that ASR "maintains clear anti-harassment reporting policies and procedures which Plaintiff admitted he failed to follow[,]" Defs.' Post-Trial Br. at 13, do not undermine the jury's credibility determinations.  The jury heard Plaintiff's narrative of events, see, e.g., Apr. 19 Trial Tr. at 346:21–353:8, 356:6–359:15, 361:13–20, 366:9–370:21, 403:24–409:1, as well as

Defendants' alternative narrative. Specifically, Defendants presented evidence and argued to the jury that Plaintiff was not a good employee, see Apr. 20 Trial Tr. at 719:14–724:25 (Defendants' counsel introducing evidence, on cross-examination, of Plaintiff's prior disciplinary history), that Plaintiff voluntarily bid out of the higher-paying job in the processing department, see, e.g., Apr. 18 Trial Tr. at 39:18–40:7, 219:22–221:16; Apr. 20 Trial Tr. at 796:17–798:21; Apr. 23 Trial Tr. at 1002:4–18, and attempted to rebut Plaintiff's testimony by questioning whether Plaintiff and witness Gaffney knew of and followed the procedures laid out by the company's codes of ethics and conduct for reporting discriminatory behavior or harassment. See Apr. 20 Trial Tr. at 742:25–745:18, 749:3–755:24 (Defendants' counsel questioning Plaintiff on whether he actually reported the actions he alleges were discriminatory to Defendant ASR), 667:14–668:1 (Defendants' counsel questioning of Gaffney as to why he did not sign any paperwork reporting Plaintiff's allegations of discriminatory behavior and whether he was aware of Defendant ASR's codes of conduct and ethics). The jury credited Plaintiff's testimony that Defendant Ramphal was discriminating against him on the basis of his race and/or national origin, and that Defendant ASR ignored Plaintiff's reports of that discriminatory behavior. To the extent that Defendants' argument is that the jury should have believed their version of the facts, the court will not disturb the jury's verdict as it does not go against the weight of the evidence.[13]

---

[13] Defendants' argument that for every specific allegation of discriminatory behavior Plaintiff made, there was a non-discriminatory explanation offered at trial is unpersuasive because it attempts to analyze whether a jury reached a seriously erroneous verdict through the lens of the McDonnell Douglas burden shifting framework. See Defs.' Post-Trial Br. at 13, 17–18; see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). However, as the Second Circuit explained, the McDonnell Douglas burden shifting framework guides a judge's determination of whether a case should proceed to a jury and not how a jury should evaluate the evidence and testimony presented during trial in considering whether a party was discriminated or retaliated against. See Gordon v. New York City Bd. of Educ., 232 F.3d 111, 118 (2d Cir. 2000).

Defendants also allege that the testimony of Plaintiff's witness Gaffney was incredible and should be disregarded.  See Defs.' Post-Trial Br. at 16–17.  Specifically, Defendants argue that Gaffney's testimony that Plaintiff complained to him on various occasions regarding Defendant Ramphal's use of the phrase "you people" and that Gaffney understood that phrase to mean the "n word" is incredible because at trial Gaffney testified that if one of his workers came to him with a claim of discrimination, he would report it, but that "he never once reported discrimination to anyone at ASR."  Defs.' Post-Trial Br. at 17 (citing Apr. 20 Trial Tr. at 667:2–669:1).  Defendants mischaracterize Gaffney's testimony before the jury, as Gaffney did not testify broadly that he never reported discrimination to anyone at ASR.  Gaffney testified as follows:

> Q. Can we agree, sir, that if you were quick to report cursing, you would also have reported something as serious as race or national origin discrimination?
> A. Correct.
> Q. Correct. And if you believed that one of your workers, as one of the people that ran for election, was actually experiencing discrimination, you would report it, right?
> A. Correct.
> Q. You are aware that the company had a code of conduct?
> A. Code of ethics, conduct, yes.
> Q. Code of ethics. And you are aware that if you realized that any of your workers or anyone, frankly, was experiencing discrimination, you had an obligation and duty to report it, isn't that true?
> A. True.
> Q. But sir, we can agree, can we not, that there is not a written document with your name on it anywhere reporting that [Plaintiff] perceived he was being discriminated against because of race and national origin, correct?
> A. Correct.

Apr. 20 Trial Tr. at 667:5–668:1.  See Apr. 20 Trial Tr. at 695:12–696:11.  The jury also heard Gaffney's testimony that although Plaintiff spoke to him regarding Defendant Ramphal's alleged discriminatory treatment, Gaffney was not the Plaintiff's union representative at that time.[14]  See

---

[14] Specifically, the jury heard Gaffney explain how he learned of Plaintiff's allegations against Defendant Ramphal, what he understood the issue to be, and what steps he recommended Plaintiff take:

Apr. 20 Trial Tr. at 602:10–603:18.  Further, the jury heard Gaffney's testimony that on two

separate occasions he reported to Mendonca, the manager of the processing department where

Plaintiff worked at the time, incidents of mistreatment alleged by Plaintiff against Defendant

Ramphal.[15]  See Apr. 20 Trial Tr. at 609:12–612:23 (testimony cited in this range is inclusive of

both pages marked as page 611).  While Gaffney did not testify that he used the word

---

Q. When did you learn that there was a problem between [Plaintiff] Lewis and [Defendant] Ramphal?

A. [Plaintiff] came to me a few times.

Q. What was your understanding of the problem between [Plaintiff] Lewis and [Defendant] Ramphal?

[. . .]

A. He says that -- Mahendra said that he couldn't run his station right; and when [Plaintiff] would ask him questions about things he didn't know, Mahendra would tell him, Don't bother me about that. You don't know what you're doing because you people are dumb, stupid, and lazy.

[. . .]

Q. Did you have discussions with [Plaintiff] about the phrase "you people"?

A. Yes.

Q. Can you tell us about those discussions?

A. Well, we discussed it -- the one time he told me, we discussed it, I said, you know, you need to go to Adolph [McBean], who is a union rep, and you need to go to Debbie [Troche]. I says, when I see Adolph, I will tell Adolph the same thing. So Adolph is supposed to go to personnel and report it, and there should be a meeting set up as soon as possible. That's the procedure.

Apr. 20 Trial Tr. at 602:15–603:18.

[15] Specifically, the jury heard Gaffney testify that he had the following conversation with Mendonca:

A: . . . So I went to Liz [Mendonca] and I told Liz, I said, You know what, Liz? This has got to stop between [Plaintiff] and Mahendra. This has been going on for years. It's still continuing here. Her response to me was: I don't go against my supervisors. And I told her, I said, You are telling me that the hourly employees here don't have no credibility. She says, I don't go against my supervisor. And I told her, If anything happens bad between these two men, they are going to hold you accountable because you are not doing anything. This has to stop. This has been going on what since 2011. It has to stop. She doesn't go against her supervisors. And then she said it to me again in 2015 with a situation with [Plaintiff] about overtime.

See Apr. 20 Trial Tr. at 609:12–612:23

"discrimination" in reporting these incidents to Mendonca, he detailed the incidents as situations in which Defendant Ramphal was targeting Plaintiff in a way that could be viewed as discriminatory.  See id.  Viewing Gaffney's testimony in totality, the jury could have reasonably determined that Gaffney was aware of Plaintiff's claims of discrimination, that Gaffney attempted to convey these allegations to Mendonca, and that Gaffney's testimony was not impeached by the fact that he did not report, in writing, Plaintiff's grievances.[16]  Accordingly, Gaffney's testimony on cross-examination does not render incredible his testimony on direct-examination that Plaintiff came to him several times to complain that Defendant Ramphal used the phrase "you people" in addressing Plaintiff, and that Gaffney understood that phrase to be discriminatory.

---

[16] Defendants argue that Gaffney is incredible because, when testifying regarding the meaning of Article 10 of the company's Collective Bargaining Agreement ("CBA"), he testified that it referred to race and/or national origin discrimination, but was impeached with grievances that cited CBA Article 10, but which "clearly did not involve race and/or national origin discrimination."  Defs.' Post-Trial Br. at 16–17. Defendants also argue that the weight of the evidence demonstrates that CBA Article 10 refers to discrimination by the union, and that it would be unreasonable for the jury to credit Gaffney and infer that Plaintiff, by citing CBA Article 10, was reporting race and/or national origin discrimination and that Defendant ASR failed to act on those claims.  See id. at 18.  However, the jury could have reasonably believed that Gaffney, as a long-time ASR employee who worked as a shop steward, a union delegate, and was at one-time vice president of the union, see Apr. 20 Trial Tr. at 593:14–596:19, had a broad interpretation of what kind of discrimination was covered by CBA Article 10.  Specifically, the jury could have believed that grievances citing CBA Article 10 were reporting discriminatory behavior by ASR staff, and defined discrimination in a broader sense than a legally cognizable claim of discrimination.  Gaffney's belief that CBA Article 10 included all kinds of discrimination, including race and/or national origin discrimination, is evident from his testimony.  For example, in response to Defendants' counsel's contention that certain grievances citing CBA Article 10 were unrelated to legally cognizable discrimination claims, Gaffney clearly stated that CBA Article 10 covers all kinds of discrimination and that at least one of the grievances counsel asked about was specifically reporting race and/or national origin discrimination.  See Apr. 20 Trial Tr. at 691:11–692:5.

Defendants also argue that Plaintiff's counsel's questioning of Troche regarding CBA Article 10 confused the jury and improperly elicited testimony regarding the Mayo-Coleman litigation, which the court, in its ruling on the motion in limine, explicitly barred.  See Defs.' Post-Trial Br. at 19.  However, Defendants' counsel was free to elicit testimony during Troche's cross-examination regarding the meaning of CBA Article 10 and what its citation on grievance notices implies.  Defendants' claims that Plaintiff confused the jury or improperly elicited barred testimony by asking about the company's past practices regarding CBA Article 10 claims are not persuasive.  Defendants' own citation reveals a simple question about a past practice.

Ultimately, Defendants ask the court to reweigh the evidence and determine that it was not reasonable for the jury to find for Plaintiff on the evidence presented. Based on all the evidence presented, a reasonable jury could determine that the weight of the evidence tipped in Plaintiff's favor. It was not unreasonable for the jury to find that credible evidence was presented to support Plaintiff's theory of the case, and the court therefore does not find that the verdict was seriously erroneous or against the weight of the evidence.

### F. The Testimony of Plaintiff's Witnesses Fred Gaffney and Darius Schullere

Defendants argue that the trial was prejudiced by the court's errors in permitting testimony from Plaintiff's witness Gaffney regarding unrelated allegations of discrimination, and in permitting hearsay testimony from Plaintiff's witness Darius Schullere. See Defs.' Post-Trial Br. at 20–21. For the reasons that follow, Defendants' arguments are not persuasive and the court will not order a new trial based on these grounds.

Defendants challenge as prejudicial Gaffney's testimony that the company "did nothing" to respond to other allegations of discrimination, which were unrelated to Plaintiff's case, but likewise resulted in litigation. See Defs.' Post-Trial Br. at 21–22. Defendants' argument that Gaffney's testimony regarding other instances of employment discrimination at and filed against Defendant ASR is not persuasive. Under the Federal Rules of Evidence, evidence will be excluded if its probative value is "substantially outweighed by [the] danger" of "unfair prejudice[.]" Fed. R. Evid. 403. Defendants' explanation for why Gaffney's testimony was prejudicial does not rise to the level of unfair prejudice that clearly outweighs the probative effect of the testimony. Here, Gaffney's testimony is probative because it relates to the procedures he saw used by the company over an extended period of time to deal with grievances. Gaffney testified based on his experience as both the shop steward at ASR from 2013 through 2016, see Apr. 20 Trial Tr. at 596:15–19, and

as an ASR employee who held several elected positions with Plaintiff's union.  See id. at 595:17–24, 596:8–15.  In addition to the example cited by Defendants in their brief, Gaffney testified to another example where the company addressed an allegation of discriminatory conduct within two weeks.  Id. at 603:18–604:6.  The jury also heard other testimony at trial, from Plaintiff and witnesses Troche and Mendonca, that tended to show that Defendant ASR did not properly respond to Plaintiff's complaints.  See, e.g., Apr. 18 Trial Tr. at 61:2–63:14 (testimony of witness Mendonca, Plaintiff's manager while he was working within the processing department, denying Plaintiff's request to have a meeting and admitting that she conveyed her belief that a meeting was not necessary to human resources manager Troche );[17] id. at 171:2–175:17, 180:14–182:12 (testimony of witness Troche, a human resources manager at ASR at the time Plaintiff was supervised by Defendant Ramphal);[18] Apr. 19 Trial Tr. at 359:10–372:2 (Plaintiff's testimony

---

[17] Specifically, the jury heard Mendonca testify that she, after consulting the Defendant ASR's human resources manager, refused to grant Plaintiff's request for a meeting between Plaintiff, Defendant Ramphal, and herself (as Plaintiff's manager), which Plaintiff had requested as a way to address and deal with the issues he was experiencing under Defendant Ramphal.  Apr. 18 Trial Tr. at 61:2–63:14.

[18] The jury could have reasonably concluded from Troche's testimony that Defendant ASR's human resources department did not respond appropriately to Plaintiff's grievances.  For example, the jury heard Troche testify that although she had an obligation to investigate any claim of discrimination in the workplace, see Apr. 18 Trial Tr. at 157:11–21, and she received two grievances Plaintiff filed alleging discrimination pursuant to CBA Article 10, she did not conduct an investigation of the claimed discrimination and instead denied the claims over a year later.  See Apr. 18 Trial Tr. at 171:2–175:17.  The jury also heard Troche testify that when  Plaintiff came to her to complain about his treatment under Defendant Ramphal, she directed him to speak to his manager, i.e., Mendonca, despite knowing that Plaintiff had already spoken to Mendonca several times and that Mendonca refused to facilitate further discussions regarding Plaintiff's complaints:

> Q. So the only response you gave to [Plaintiff] when he came to you to complain about his treatment by [Defendant] Ramphal was: I'm not going to hear it. You've got to go to your supervisor first. Correct?
>
> A. Not in those exact words.
>
> Q. What exact words did you use?
>
> A. I would say to any employee that came that they would need to go to their manager or supervisor first to resolve the issue.
>
> Q. Now, you know that [Plaintiff] did go to his manager first. You know that, right?

recounting his reports of Defendant Ramphal's behavior to manager Mendonca and human resources manager Troche).[19]

Regarding the testimony of Plaintiff's witness Schullere, Defendants contend that the court allowed impermissible hearsay testimony which prejudiced Defendants by "improperly

---

A. I don't remember the exact day that we were talking or -- I don't remember. I'm sorry.

Q. Well, who was his manager?

A. Liz Mendonca.

[. . .]

Q. And you know that he had already gone to Liz Mendonca to complain about how he was being treated by [Defendant] Ramphal. Isn't that correct? You know that, right?

A. Well, he had -- I don't know if it was before or after that instance you are talking about.

Q. You know that -- you knew at the time, after he came to you, you know that [Plaintiff] had gone to her a couple of times after that to speak about his complaints about the way [Defendant] Ramphal was treating him, right?

A. I know he spoke to her.

Q. How do you know that?

A. Because any time he came to me, I would say, you need to speak to Liz about it. And I know Liz spoke to him on occasion. I don't know exactly how many times they spoke, but I would always refer the employees back to their supervisors or managers to work out the issues.

Q. And you know that [Plaintiff] went to Ms. Mendonca because Ms. Mendonca told you that, right?

A. Yeah. I don't know how many times they met. I don't remember.

Apr. 18 Trial Tr. at 180:14–182:2.

[19] Specifically, the jury heard Plaintiff's testimony that he reported the alleged discrimination to human resources and informed the human resources manager, his manager, and his shop steward of his request that they facilitate a supervised meeting with Defendant Ramphal to address the issues Plaintiff was experiencing, and that no actions were taken by any of the managerial or human resources staff. See Apr. 19 Trial Tr. at 359:10–372:2.

The jury also heard Plaintiff testify that he approached Mendonca several times, requesting a meeting and was continually denied. See, e.g., Apr. 19 Trial Tr. at 395:3–17 (Plaintiff's testimony that Mendonca denied his request for a meeting, after he told Mendonca that disciplinary actions taken against him were "more of the same thing" and exemplified how the situation between him and Defendant Ramphal was escalating), 405:5–19 (Plaintiff's testimony that he "needed to leave" his position in the processing department because the situation with Defendant Ramphal was not being resolved and he "was not being heard by Ms. Mendonca while trying to get a meeting"), 409:2–14 (Plaintiff's testimony that he "reminded" Mendonca of his request for a meeting a "number of times" and in response, Mendonca provided a "host of reasons [for] why we couldn't have the meeting"), 431:12–22 (same).

bolster[ing] Plaintiff's testimony." Defs.' Post-Trial Br. at 21. Specifically, the line of questioning that Defendants take issue with is:

> [Plaintiff's counsel]:   And what would [Plaintiff] tell you about his experiences as it relates to Mahendra Ramphal?
>
> [Defendants' counsel]: Objection, your Honor. That's hearsay.
>
> THE COURT:   Well, it is for his impression, so I'm going to say overruled.
>
> [Plaintiff's counsel]:   Thank you.
>
> [Mr. Schullere].   Okay. Well, he became a manager at one point. Since [Plaintiff] had been at the job for over 25 years, he loved the job. Suddenly, once this person became a manager, his manager, it seemed to be devastating to [Plaintiff] because from things that I have heard the man seems to be a racist. He -- well, he is always harassing [Plaintiff]. He will not give him overtime, and seems to be the general way things go on the job with other black people and so forth with this guy.

Apr. 20 Trial Tr. at 703:22–704:10; see Defs.' Post-Trial Br. at 21. Schullere's testimony was not admitted for the truth of the matter asserted. Instead, it was offered for Schuller's impression of how Plaintiff's behavior and demeanor changed during the relevant time. In fact, during cross-examination Defendants' counsel elicited from Schullere that his testimony and perception of Defendants was based on Plaintiff's allegations, that Schullere has never spoken or met with Defendant Ramphal, and that Schullere never witnessed any of the allegedly discriminatory behavior. Apr. 20 Trial Tr. at 708:13–709:12. Indeed, the jury heard the same statements from Plaintiff himself, [20] to which Defendants did not object. The court does not find that allowing the

---

[20] Regarding overtime, Plaintiff himself testified that Defendant Ramphal denied him overtime opportunities. See Apr. 19 Trial Tr. at 366:23–367:10, 374:7–375:9. Plaintiff also testified that Defendant Ramphal harassed him, see id. at 408:13–16 ("I was anxious that every day I was coming in and being badgered and harassed . . . ."), and testified that he told others about this harassment, see id. at 455:24–456:4 ("I told [ASR superintendent Lucious Green] that I believe that [Ramphal] is discriminating against me and I think he's harassing me . . . ."), and testified to his understanding that Defendant Ramphal discriminated against other African-American workers. See id. at 450:1–14 (recounting a similar incident involving Defendant Ramphal and another African-American worker).

jury to hear these comments from Schullere prejudiced Defendants. The jury was aware that these statements by Schullere were not based on his own observation and could weigh it accordingly.

### G.  The Alleged Excessiveness of the Jury's Award

Finally, Defendants allege that a new trial is warranted because the jury's verdict is excessive. <u>See</u> Defs.' Post-Trial Br. at 21–22. Defendants support their challenge by citing to the reasons proffered in their brief for why remittitur is appropriate. <u>Id.</u>; <u>see also</u> <u>id.</u> at 43–50. The court addresses the issue of remittitur below, and for the reasons provided there, the jury's actual and punitive damages awards are not excessive as to warrant a new trial. However, the jury's compensatory damages award must be remitted as not to be excessive. Accordingly, Plaintiff may accept the remitted compensatory damages amount or proceed to a new trial on damages.

## II.  DEFENDANTS' RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW

Post-trial, Defendants renew their motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b). <u>See</u> Defs.' Post-Trial Br. at 22–43. Defendants raise five grounds in support of this challenge, arguing that: 1) the evidence does not support a finding of race and/or national origin discrimination; 2) the evidence does not support a finding of hostile work environment under Title VII or NYSHRL; 3) the evidence does not support a finding of retaliation; 4) Plaintiff failed to identify any evidence to support an award of punitive damages; and 5) the evidence does not support the jury's award of actual damages. <u>Id.</u> Defendants offered the same grounds when moving for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). See Apr. 23 Trial Tr. at 912:5–921:9. The court reviews each challenge in turn and, for the reasons that follow, denies on all grounds Defendants' motion for judgment as a matter of law.

## A. Legal Standard

Rule 50(b) of the Federal Rules of Civil Procedure governs renewed motions for judgment

as a matter of law after the jury has returned a verdict and judgment has been entered.  Fed. R. Civ.

P. 50(b).  Pursuant to this rule,

> [i]f the court does not grant a motion for judgment as a matter of law made under
> Rule 50(a), the court is considered to have submitted the action to the jury subject
> to the court's later deciding the legal questions raised by the motion. No later than
> 28 days after the entry of judgment—or if the motion addresses a jury issue not
> decided by a verdict, no later than 28 days after the jury was discharged--the movant
> may file a renewed motion for judgment as a matter of law and may include an
> alternative or joint request for a new trial under Rule 59. In ruling on the renewed
> motion, the court may:
> > (1) allow judgment on the verdict, if the jury returned a verdict;
> > (2) order a new trial; or
> > (3) direct the entry of judgment as a matter of law.

Id.  A post-trial motion for judgment as a matter of law pursuant to Rule 50(b) "should be denied

unless, viewed in the light most favorable to the nonmoving party, 'the evidence is such that,

without weighing the credibility of the witnesses or otherwise considering the weight of the

evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have

reached.'"  Samuels v. Air Transp. Local 504, 992 F.2d 12, 14 (2d Cir. 1993) (quoting Simblest v.

Maynard, 427 F.2d 1, 4 (2d Cir. 1970)); see Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 494

(2d Cir. 1995).  Under Rule 50, a jury verdict should be set aside and the motion granted, only

when there is "such a complete absence of evidence supporting the verdict that the jury's findings

could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming

amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive

at a verdict against him."  Mattivi v. South African Marine Corp., "Huguenot", 618 F.2d 163, 168

(2d Cir. 1980); Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154 (2d

Cir. 1994).  The court will credit evidence favorable to the moving party "that is uncontradicted

and unimpeached," and must "disregard" evidence that the jury is not required to believe, but which is favorable to the moving party. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 151 (2000). The standard of review is the same whether the motion for judgment as a matter of law is submitted prior to the verdict being issued, or post-trial. See Alfaro v. Wal-Mart Stores, Inc., 210 F.3d 111, 114 (2d Cir. 2000).[21] It is a strict standard, and the court will grant a Rule 50 motion only if it determines that a reasonable jury would not have a legally sufficient basis for reaching a verdict for the nonmoving party.

## B. The Jury's Finding of Race and/or National Origin Discrimination

Defendants argue that Plaintiff failed to put forth sufficient evidence to support a prima facie case of race and/or national origin discrimination because he did not demonstrate that he suffered an adverse employment action and that Defendants acted with the requisite discriminatory intent. See Defs.' Post-Trial Br. at 23–28. Plaintiff argues that he was subjected to a variety of suspensions and arbitrary discipline, denied overtime, and demoted, and that Defendants' actions convey discriminatory intent. See Pl.'s Resp. Br. at 25–30. For the following reasons, the court agrees with Plaintiff.

Plaintiff has the initial burden of providing sufficient evidence establishing a prima facie case of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).[22] A prima facie case is composed of four elements, but here, Defendants only challenge Plaintiff's

---

[21] The court reserved ruling on the motion for judgment as a matter of law raised by Defendants' counsel after Plaintiff rested his case. See Apr. 23 Trial Tr. at 925:5–8. Given that the standard of review is the same, the court's analysis denying Defendants' motion for judgment as a matter of law post-trial, applies in equal part to Defendants' arguments raised pre-trial and that motion is likewise denied.

[22] Discrimination claims brought under NYSHRL are reviewed under the same standards applicable to Title VII discrimination claims. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000), superseded by statute on other grounds, N.Y.C. Local L. No. 85, as recognized in Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013).

showing on the last two elements, namely that Plaintiff suffered an adverse employment action and that the adverse action occurred under circumstances giving rise to an inference of discrimination. McDonnell Douglas, 411 U.S. at 802–04; see Defs.' Post-Trial Br. at 23–24. An adverse employment action is characterized by the existence of a "materially adverse change in the terms and conditions of employment. . . . [that is] more than a mere inconvenience or an alteration of job responsibilities." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks, footnote, and citations omitted) (relying on the reasoning in Crady v. Liberty Nat. Bank & Tr. Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993)). Examples of materially adverse changes include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, . . . or other indices . . . unique to a particular situation." Id. (internal quotation marks and citation omitted). A de minimis showing has been characterized as being sufficient to establish a prima facie case of discrimination. Zann Kwan v. Andalex Grp., LLC, 737 F.3d 834, 844–45 (2d Cir. 2013). In evaluating a motion for judgment as a matter of law in a discrimination action, the court will, on a case-by-case basis determine whether plaintiff "could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves, 530 U.S. at 143). Accordingly, the court must determine whether, given the totality of the record, see Reeves, 530 U.S. at 149–51, a reasonable jury could have concluded that Plaintiff sufficiently put forth a prima facie case of discrimination, and it was reasonable for the jury to disbelieve the defending party's proffered legitimate business explanation for the alleged discriminatory treatment. Id.

At trial, the jury heard sufficient testimony supporting Plaintiff's claim that he was subjected to several materially adverse employment actions. Specifically, the jury heard testimony

explaining how, as a result of Defendant Ramphal's actions and Defendant ASR's inactions, Plaintiff lost overtime opportunities, was forced to transfer to a lower-paying position, and was ultimately demoted.[23]   Plaintiff testified that as a result of Defendant Ramphal's behavior, <u>see, e.g.</u>, Apr. 19 Trial Tr. at 356:6–359:9, his opportunities for overtime lessened, <u>see</u> Apr. 19 Trial Tr. at 372:3–17, 374:7–375:9, and that he lost out on holiday pay and was improperly disciplined. <u>See</u> Apr. 19 Trial Tr. at 336:8–342:3.[24]   The jury also heard that Plaintiff bid out to a lower-paying job to avoid the negative implications of working under Defendant Ramphal's supervision.  <u>See</u> Apr. 19 Trial Tr. at 403:24–409:14.   While technically "voluntary," this was a change Plaintiff pursued after exhaustively appealing for help from manager Mendonca and human resources manager Troche and receiving no response, and out of concern for his well-being.[25]  <u>See, e.g.</u>, Apr. 19 Trial Tr. at 405:5–406:17, 407:23–409:14.

---

[23] Defendants, however, argue that Plaintiff's allegations are insufficient because during the relevant time period Plaintiff suffered no material adverse change to the terms and conditions of his employment, Plaintiff continues to be employed by Defendant ASR, Plaintiff did not lose any benefits, and Plaintiff voluntarily transferred into a lower-paying position. <u>See</u> Defs.' Post-Trial Br. at 23–24. In fact, Defendants specifically state that the evidence cannot support the verdict because Plaintiff's testimony is not credible, <u>see</u> <u>id.</u> at 11, and because Plaintiff failed to articulate a reason for his bid out, other than that the position was "available," indicating that the transfer was indeed voluntary. <u>Id.</u> at 23–24.

[24] Defendants argue that the jury should not have considered Plaintiff's allegation that he was improperly denied holiday pay, because that allegation is time barred.  <u>See</u> Defs.' Post-Trial Br. at 25.  At trial, Defendants' counsel did not object to Plaintiff's testimony regarding this incident, and has waived its challenge.

[25] The jury heard direct testimony that the Plaintiff bid out to a lower-paying job to avoid Defendant Ramphal's supervision:

> Q. [Plaintiff], can you take a look at the exhibit that's marked JX 17, please. Can you tell me what this document is?
>
> [. . .]
>
> A. It's my application [for a job change on October 18, 2012]. When I was at remelt, I applied for the job as a warehouseman.
>
> [. . .]
>
> Q. How much does warehouse pay compared to process?
>
> A. It's a lower rate.

Plaintiff also testified that Defendant ASR's failure to respond to his complaints and issuance of unwarranted disciplinary notices led to several adverse employment actions. Specifically, the jury heard that because Plaintiff's grievances went unanswered by Defendant ASR's managerial and human resources staff, he transferred to a lower-paying position, and that

---

Q. Is there more overtime opportunities in warehouse or process or are they the same?

A. Maybe the same, sometimes warehouse a little bit more. It's -- it just varies from person to person, because also I would be there as the low man, so it may not be as much as the other people who are there.

Q. What do you mean by low man?

A. I would have the lowest department seniority, so as far as overtime in that department, I would be the last one to get it.

Q. How much less does warehouse pay than process?

A. I believe, than the remelt, was about, I guess, about . . . .

[. . .]

A. Maybe a dollar, maybe a little less an hour.

Q. When you applied for this job, did you understand that you would make less money at warehouse?

A. Yes.

Q. Why did you apply for the job in warehouse?

A. I needed to really get out of remelt. I thought that I was going to have more problems and things were not getting any better. I wasn't getting my meeting, and I was feeling sick. I was getting upset, anxious. My stomach was getting all knotted, and I was getting sick even on the job sometimes. And I thought this would be -- it was like I had to do something, so the warehouse job became available, so I applied for it, because I just needed to leave. It would help with health, best for my health, I figured.

Q. Why did you need to leave?

A. I was having many problems with [Defendant] Ramphal, I was not being heard by Ms. Mendonca while trying to get a meeting. I was starting to get writeups. I thought this was going to get worse, and I just needed to leave.

Q. How many times throughout your career at American Sugar have you bid for a lower paying job?

A. Never.

Q. Other than this time?

A. Other than this time, yes.

Apr. 19 Trial Tr. at 403:22–405:24.

the continued improper discipline resulted in Plaintiff being placed on the last step of the discipline process and demoted to a position in sanitation.  <u>See</u> Apr. 19 Trial Tr. at 336:8–342:3, 375:13–380:9, 403:24–409:14, 486:25–491:3.  The jury also heard Mendonca testify that Plaintiff approached her on three occasions, beginning in the fall of 2011, to discuss how his supervisor, i.e., Defendant Ramphal, was treating him and requesting a meeting on two of those occasions, <u>see</u> Apr. 18 Trial Tr. at 59:9–61:1, but that she denied his request for a meeting, told human resources manager Troche that a meeting would not be productive and should not happen, <u>see</u> Apr. 18 Trial Tr. at 61:2–62:7, and that, instead, she would speak with Defendant Ramphal herself.  <u>See</u> Apr. 18 Trial Tr. at 63:16–64:23.  However, during trial Defendant Ramphal testified that no one at the company made him aware of Plaintiff's complaints against him until October of 2016.  <u>See</u> Apr. 20 Trial Tr. at 826:2–828:13.  The jury also heard Gaffney's testimony that after witnessing a specific instance of Defendant Ramphal "hollering" at Plaintiff, he reported the incident to Plaintiff's manager, Mendonca.  <u>See</u> Apr. 20 Trial Tr. at 609:16–611:3 (testimony cited in this range is only inclusive of the first page marked as page 611).

The jury also heard Mendonca testify that 24-months after Plaintiff's initial request for a meeting, that meeting was held because the relevant people happened to be in the room.  <u>See</u> Apr. 18 Trial Tr. at 65:8–68:23.  According to Mendonca, the meeting was cut short and Plaintiff disciplined for "poor job performance," <u>see</u> Apr. 18 Trial Tr. at 73:4–12, 75:22–76:1, because, in contrast to what Plaintiff told her previously, <u>see</u> Apr. 18 Trial Tr. at 73:17–75:9, a machine at his station was not running, and it should have been.  <u>See</u> Apr. 18 Trial Tr. at 68:24–69:14.  However, Plaintiff explained that Mendonca knew that the machine was down when she called him in for the meeting, <u>see</u> Apr. 19 Trial Tr. at 434:8–435:24, 437:14–438:6, and testified that he believed he was disciplined in an effort to "put [him] on track to getting fired[.]"  Apr. 19 Trial Tr. at 439:4–

17.  Plaintiff testified about other instances when he was disciplined for improper or false reasons, and issued discipline harsher than would normally be warranted for the same infraction.[26]  Plaintiff explained that, as a result of this continuous and unwarranted discipline, he was at the last stage of the progressive discipline process, i.e., in the termination stage, and was presented with a last chance agreement by the company, which would have barred Plaintiff from filing grievances.[27]  Although the company did not proceed with the last chance agreement, Plaintiff was demoted to a lower-salaried position in the sanitation department instead.  Accordingly, the jury could have reasonably concluded that Plaintiff was subjected to several adverse employment actions.

The jury also heard testimony from which it could have reasonably determined that the adverse employment actions Plaintiff suffered "occurred under circumstances giving rise to an inference of discrimination."  United States v. Brennan, 650 F.3d 65, 92–93 (2d Cir. 2011) (relying on several cases issued by the Court of Appeals for the Second Circuit to provide the factors

---

[26] Specifically, the jury heard Plaintiff testify in January of 2013, he was disciplined for failing to show up for a shift supervised by Defendant Ramphal, that he was unaware he was scheduled to work, that even if he was scheduled, the normal procedure of calling to check why he was missing was not followed, that employees are "[o]ften not" disciplined for such an infraction, and that in his case, the discipline "seemed to skip a step[,]" resulting in Plaintiff receiving a three-day suspension, a heightened discipline on the discipline scale than was warranted.  Apr. 19 Trial Tr. at 421:22–431:2.  At trial, Gaffney testified that the company's policy is to "give [a missing employee] the courtesy of calling[,]" and that he was present when Defendant Ramphal and another supervisor decided not to call Plaintiff.  Apr. 20 Trial Tr. at 629:9–631:11.  The jury also heard Plaintiff testify that in June of 2012, he was disciplined for refusing to follow Defendant Ramphal's directive, but explained that he did so, because it was in direct contravention to the company's protocol, as annunciated by Mendonca, that brown sugar is a priority and that it needed to be set up first.  Apr. 19 Trial Tr. at 375:19–378:25.

[27] The jury also heard Gaffney, Mendoca, and Troche testify that they had not heard of a last chance agreement previously being used at Plaintiff's workplace.  See Apr. 18 Trial Tr. at 98:4–7, 98:22–99:2 (Mendonca testifying that in her time with the company this was the first time she had seen such an agreement); 188:18–24 (Troche testifying that the last chance agreement had not previously been used at the plant Plaintiff worked); Apr. 20 Trial Tr. at 639:5–13 (Gaffney testifying that in his time with the company he had not heard of such an agreement).  Given that the last chance agreement contained a specific provision preventing Plaintiff from grieving any discipline issued prior to December 3, 2013, the time period when Plaintiff was supervised by Defendant Ramphal, the jury could have reasonably inferred that Defendant ASR was materially altering the terms and conditions of Plaintiff's employment.

necessary to make out a prima facie case under the McDonnell Douglas burden shifting framework).  "[A]n inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to: . . . the employer's criticism of the plaintiffs performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group[.]"  Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009).  Phrases such as "you people" can be construed "as circumstantial evidence of "discriminatory animus," Whitehurst v. 230 Fifth, Inc., 998 F. Supp. 2d 233, 253 n.14 (S.D.N.Y. 2014) and as connoting a racial meaning, see Hill v. City of New York, 136 F. Supp. 3d 304, 337 (E.D.N.Y. 2015), especially when presented in conjunction with evidence of discriminatory treatment.  See Winston v. Verizon Servs. Corp., 633 F. Supp. 2d 42, 53 (S.D.N.Y. 2009).

At trial, the jury heard Plaintiff testify to Defendant Ramphal's use of the phrase "you people" and that he understood it to mean the "n word."  See, e.g., Apr. 19 Trial Tr. at 348:21–349:2.  Gaffney testified that he had the same understanding of the phrase.  Apr. 20 Trial Tr. at 603:3–7.  Plaintiff also testified that Defendant Ramphal would often engage in the same "rant," Apr. 19 Trial Tr. at 349:19–350:2, comparing the capabilities and work ethics of Guyanese employees with those of "you people" and using language such as, "you people are so stupid" in comparison to the Guyanese employees at the company.  Apr. 19 Trial Tr. at 347:25–348:7, 349:15–350:21.  Plaintiff testified to several other incidents in which he was singled out by Defendant Ramphal.  See, e.g., Apr. 19 Trial Tr. at 447:14–448:18 (Plaintiff's testimony that Defendant Ramphal, in the break room and in front of other employees, told Plaintiff that he had to ask for permission before taking a slice of pizza that was available for everyone); Apr. 19 Trial Tr. at 448:20–449:1 (Plaintiff's testimony that, without his permission, Defendant Ramphal used

Plaintiff's initials to run lab samples); Apr. 19 Trial Tr. at 450:1–14 (Plaintiff's testimony that

Defendant Ramphal changed the machine settings of another African-American ASR employee);

Apr. 19 Trial Tr. at 351:9–352:20, 450:21–451:23 (Plaintiff recounting several incidents where

Defendant Ramphal would use the company's walkie-talkie system in a manner Plaintiff perceived

was meant to "ridicule" and single him out specifically).  The jury also heard testimony regarding

Plaintiff's contact with Defendant ASR's managerial and human resources staff, and from which

the jury could have reasonably inferred discriminatory intent.  See, e.g., Apr. 18 Trial Tr. at 61:2–

63:14 (Mendonca continually denying Plaintiff's request for a meeting, despite knowing, at the

very least, that Plaintiff had an issue with how Defendant Ramphal was treating him); Apr. 19

Trial Tr. at 376:8–378:25 (Plaintiff's testimony that Mendonca dismissed his complaint that he

was disciplined arbitrarily); Apr. 18 Trial Tr. at 250:23–257:25, 270:5–272:1 (Troche's testimony

that other persons claiming discrimination relied on Article 10 of the Collective Bargaining

Agreement ("CBA"), but that Troche did not investigate further and instead dismissed

approximately a year later two grievances filed by Plaintiff citing the same article).  Viewed in the

light most favorable to Plaintiff, there is sufficient evidence to find that, rather than being "hard

on all employees, including Plaintiff," Defendant Ramphal exhibited discriminatory intent towards

Plaintiff specifically.  Accordingly, the jury could have reasonably determined that the adverse

employment actions were motived by a discriminatory intent.[28]

---

[28] In its Fed. R. Civ. P. 50(a) motion, Defendants' counsel argued that Plaintiff failed to make out a case for race and/or national origin discrimination in part because Defendant Ramphal did not sign nor make any of the decisions that resulted in Plaintiff being disciplined.  See Apr. 23 Trial Tr. at 917:11–918:1, 919:11–13.  However, the jury heard that Plaintiff was issued a disciplinary notice, signed by manager Mendonca and Joseph ("Joe") Fornabio, Defendant Ramphal's supervisor, see Apr. 18 Trial Tr. at 109:2–4, for failing to follow Defendant Ramphal's directive.  See Apr. 19 Trial Tr. at 375:10–378:25.  Plaintiff explained that the directive was in direct contradiction to what he knew the company protocol to be and what manager Mendonca told him in the past.  See id.; see also discussion supra note 26 (identifying another incident).  The jury's conclusion is reasonable based on evidence presented at trial.

Defendants argue that the jury's finding of discriminatory intent was not reasonable because at trial, each of Plaintiff's allegations was explained by a non-discriminatory and valid business decision.[29]  On a motion for judgment as a matter of law, the court will credit testimony favorable to the movant, if that testimony was not impeached or contravened.  See Reeves, 530 U.S. at 151.  Defendants, however, continually refer the court to testimony that was contravened or testimony that on its own does not constitute "an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him." Mattivi, 618 F.2d at 168; see Defs.' Post-Trial Br. at 25–28.  In light of the factual record, the jury could have reasonably found for the Plaintiff.  Accordingly, Plaintiff carried his "ultimate burden," see Reeves, 530 U.S. at 143 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)), of demonstrating that he was intentionally discriminated against and rebutting any legitimate business reasons offered for the treatment.

**C.  The Jury's Finding of a Hostile Work Environment**

Defendants argue that the testimony offered at trial is insufficient to sustain the jury's verdict that Plaintiff was subjected to a hostile work environment.  See Defs.' Post-Trial Br. at 28–34.  Plaintiff argues that it is reasonable to infer from the record that Defendant Ramphal favored Guyanese employees and took actions to humiliate and harass Plaintiff on the basis of that preference.  See Pl.'s Post-Trial Br. at 30–31.  For the following reasons, the court agrees with Plaintiff.

---

[29] Specifically, the jury heard testimony from Plaintiff's manager, Mendonca, that she believed the issues between Plaintiff and Defendant Ramphal arose because Defendant Ramphal was particular and "strict" with how the work should be done, and Plaintiff did not like that supervisory style.  See Apr. 18 Trial Tr. at 135:7–16; see also id. at 61:23–62:7 (Mendonca's testimony that she told Troche that the conflict between Defendant Ramphal and Plaintiff arose out of a "difference of opinions" and that "they didn't necessarily work well together").  Further, Mendonca testified that Plaintiff "tended to be a little argumentative. . . . [and that] [i]f you told him to do something and he didn't really agree with it, he would argue."  Apr. 18 Trial Tr. at 109:25–110:2.

"[T]o prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." Summa v. Hofstra Univ., 708 F.3d 115, 124 (2d Cir. 2013) (quoting Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009)). The court evaluates the entire record "to obtain a realistic view of the work environment," Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 21 (2d Cir. 2014) (citation omitted), and should not "view individual incidents in isolation." Redd v. New York Div. of Parole, 678 F.3d 166, 176 (2d Cir. 2012). Further, plaintiff only needs to demonstrate that the alleged hostile working environment was "sufficiently severe or pervasive, or a sufficient combination of these elements, to have altered her working conditions." Id. at 175 (quoting Pucino v. Verizon Communications, Inc., 618 F.3d 112, 119 (2d Cir. 2010)). The court's analysis looks at whether the alleged conduct was objectively discriminatory to a reasonable person and subjectively perceived as such by the plaintiff, and is guided by the following non-exhaustive list of evaluative factors:

> (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a "mere offensive utterance;" (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted.

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Here, looking at the record as a whole, Plaintiff set forth sufficient evidence to support an inference that the harassment he suffered was sufficiently severe to alter his working conditions and created a hostile working environment. Plaintiff testified to a variety of instances where Defendant Ramphal used discriminatory language on the basis of race and/or national origin against Plaintiff. See, e.g., Apr. 19 Trial Tr. at 356:6–359:9, 366:9–17, 431:3–11. Plaintiff

testified to the severity, frequency, and longevity of Defendant Ramphal's harassment over the walkie-talkie system, <u>see</u> Apr. 19 Trial Tr. at 351:7–352:20, 450:15–451:17, 460:7–461:15, while Gaffney testified that he did not hear Defendant Ramphal berate the Guyanese employees in the same manner.[30]   <u>See</u> Apr. 20 Trial Tr. at 608:16–609:9.   Plaintiff also testified to Defendant Ramphal's use of the phrase "you people," which both Plaintiff and Gaffney interpreted to mean the "n word," in reference to Plaintiff and another African-American employee.   Specifically, Plaintiff testified that Defendant Ramphal would "rant" that Guyanese employees were superior or predisposed in terms of working with sugar,[31] <u>see, e.g.</u>, Apr. 19 Trial Tr. at 349:24–350:2, 356:6–359:9, and compare the Guyanese employees' abilities with those of "you people," who are stupid, in reference to Plaintiff and another African-American employee.   Apr. 19 Trial Tr. at 348:21–351:6.   The jury was free to accept Plaintiff's understanding of the phrase "you people" as a phrase having a racial connotation.   Plaintiff also testified that Defendant Ramphal changed settings on his machines, without providing notice, and would use Plaintiff's initials to run lab tests, which could have resulted in Plaintiff's work station malfunctioning or Plaintiff being disciplined.[32]   The jury also heard Plaintiff's testimony that he was "degraded" and "badgered" by

---

[30] Gaffney also testified that he witnessed Defendant Ramphal "hollering at [Plaintiff]" regarding poor results at one of the stations, although Defendant Ramphal knew that the entire station was "messed up" and the produced sugar came "out of spec," Gaffney was the one running the station for the past eight hours, and Plaintiff had just arrived at work.   Apr. 20 Trial Tr. at 610:6–15.   The jury also heard Gaffney's testimony that Defendant Ramphal misused the plant's walkie-system, which was tuned to the same frequency as many of the other departments in the company, to disparage, berate, and yell at Plaintiff and other workers, instead of speaking to them face-to-face to discuss work related issues, and that Gaffney did not hear Defendant Ramphal employ the same tactics with Guyanese employees.   <u>See</u> Apr. 20 Trial Tr. at 608:16–609:9.

[31] Defendants argue that Plaintiff failed to draw the required connection between the alleged bad words and the creation of the hostile work environment because Plaintiff's allegations are, at best, of "episodic" conduct.   Defs.' Post-Trial Br. at 32.   However, Plaintiff was not required to list out "each and every instance of abuse to show pervasiveness."   <u>Pucino</u>, 618 F.3d at 120.

[32] Defendants argue Plaintiff and numerous witnesses testified that Defendant Ramphal, as a supervisor, was allowed to change Plaintiff's machine's settings.   <u>See</u> Defs.' Post-Trial Br. at 27.   However, it wasn't the changing of the settings that Plaintiff complained of at trial, but Defendant Ramphal's failure to

Defendant Ramphal's use of the walkie-system, and that Defendant Ramphal would single him out. See Apr. 19 Trial Tr. at 351:7–352:20.

There is also sufficient evidence such that the jury could conclude that the employer was responsible for creating the hostile work environment Plaintiff described. The jury heard that Defendant ASR's managerial and human resources staff did not respond to Plaintiff's complaints and instead told Plaintiff that he should first work out any issues with his supervisor, i.e., Defendant Ramphal. See, e.g., Apr. 18 Trial Tr. at 61:2–63:14, 181:13–23, 173:11–175:23; Apr. 19 Trial Tr. at 360:19–20. Plaintiff testified that as a result of such a work environment, he transferred to a lower-paying position because it was away from Defendant Ramphal's supervision. See Apr. 19 Trial Tr. at 405:5–19. The jury also heard about the meeting where Plaintiff was offered a choice to either sign a last chance agreement or be terminated, see Apr. 19 Trial Tr. at 481:2–8, 486:24–489:15, that the last chance agreement would have prevented him from grieving company conduct with the union, see Apr. 19 Trial Tr. at 481:2–8, and that although the last chance agreement was withdrawn, see Apr. 19 Trial Tr. at 487:9–491:3, as a result of this meeting Plaintiff felt like he could not grieve a specific prior disciplinary ticket. See Apr. 19 Trial Tr. at 481:1–18. Therefore, sufficient evidence exists such that the jury could conclude that Defendants' actions were sufficiently severe and pervasive to create a hostile working environment which altered Plaintiff's working conditions.

### D.  The Jury's Finding of Retaliation

Defendant argues that Plaintiff failed to prove a claim of retaliation because there is no

---

communicate any of these changes to Plaintiff. See Apr. 19 Trial Tr. at 368:11–370:3. Accordingly, the testimony was offered to show that Defendant Ramphal altered the settings as to worsen Plaintiff's work situation and potentially cause his station to produce sugar of bad quality. See Apr. 19 Trial Tr. at 369:12–17.

record evidence proving that Defendants received notice of the EEOC Charge or that any of the individuals who disciplined Plaintiff were aware of it by some other means. See Defs.' Post-Trial Br. at 34–36. Plaintiff argues that Defendants knew of the protected activity given that Plaintiff grieved the allegedly discriminatory treatment with the company, the EEOC mailed Defendant ASR a copy of the charge of discrimination Plaintiff filed, and Plaintiff filed this lawsuit shortly after receiving the right to sue letter from the EEOC. See Pl.'s Resp. Br. at 32–34. For the reasons that follow, the court agrees with Plaintiff.

Under Title VII, the materially adverse action must be "harmful to the point that [it can] well dissuade a reasonable worker from making or supporting a charge of discrimination." See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). The plaintiff's burden to establish a prima facie case of retaliation is de minimis. See Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (citation omitted). If plaintiff maintains its burden, "a presumption of retaliation arises[,]" Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005), which defendant may rebut by providing a legitimate, nondiscriminatory reason for the allegedly retaliatory actions. Summa, 708 F.3d at 125. If defendant succeeds in offering such a reason, the presumption "dissipates," Jute, 420 F.3d at 173, and the burden shifts back to plaintiff to demonstrate that the retaliatory motive was the "but-for cause of the challenged employment action." Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 70 (2d Cir. 2015) (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013)).[33] "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action[,] [as]

---

[33] Plaintiff's retaliation claim is analyzed pursuant to Title VII principles, because NYSHRL applies the federal standard to state retaliation claims. See Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1177 (2d Cir. 1996).

[f]rom such discrepanc[y], a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." Zann Kwan, 737 F.3d at 846.

Plaintiff complained of discrimination as early as fall of 2011 and filed two grievance notices citing CBA Article 10 in March of 2013. See Apr. 18 Trial Tr. at 59:9–61:1 (Mendonca's testimony that Plaintiff came to her as early as fall of 2011 reporting "issues" with Defendant Ramphal); Apr. 19 Trial Tr. at 359:10–361:12 (Plaintiff's testimony regarding the first time he reported Defendant Ramphal's actions to manager Mendonca); Apr. 19 Trial Tr. at 462:24–465:23 (Plaintiff's testimony explaining the two March 2013 grievances, which were entered into evidence as exhibits JX-12 and JX-13). Plaintiff filed his EEOC complaint on March 14, 2013, see Apr. 19 Trial Tr. at 445:7–14 (admitting into evidence exhibit JX-24, reproducing the dated and signed copy of Plaintiff's EEOC intake form), testified that he gave the EEOC permission to investigate on December 5, 2013, see Apr. 19 Trial Tr. at 497:3–9, and filed this lawsuit on March 27, 2014, after receiving the right to sue letter on February 7, 2014. See Compl. Accordingly, here, the retaliation claims are in two parts—retaliation following Plaintiff's filing of complaints alleging discrimination internally to the company's human resources department, and retaliation after Plaintiff filed his EEOC complaint.

Plaintiff participated in a protected activity by filing two complaints with the company's human resources department citing CBA Article 10, by filing a complaint with the EEOC, and finally by filing the present lawsuit. Filing of informal complaints to management, for example, is a protected activity. See Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990). Plaintiff cited CBA Article 10 in two of the complaints he submitted, and which, as the court also explained above, the jury could have reasonably interpreted as referring to race and/or national origin discrimination.

Defendants were aware of Plaintiff's protected activity even before Plaintiff filed an EEOC complaint and filed this litigation. At trial, manager Mendonca and human resources manager Troche testified that they were aware of Plaintiff's complaints against Defendant Ramphal as early as 2011, see Apr. 18 Trial Tr. at 58:22–60:7 (Mendonca's testimony), 179:16–182:2 (Troche's testimony), which is enough to impune "general corporate knowledge" of Plaintiff's protected activity to the company. See Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000); Zann Kwan, 737 F.3d at 844. Further, although witness Mendonca testified that it was not until Defendants' counsel was hired that Defendants learned of Plaintiff's allegations of discrimination, see Apr. 18 Trial Tr. at 99:5–20, 114:22–115:8, it was not unreasonable for the jury to believe otherwise. It is reasonable to infer that the company received the EEOC Charge when it was sent by the EEOC.

Plaintiff also suffered several employment actions that were materially adverse. The jury heard evidence that Plaintiff lost overtime opportunities, was disciplined arbitrarily, transferred to a different department, and accepted a lower salary as a result of Defendant ASR's inaction, and was presented with a last chance agreement that would have prevented Plaintiff from grieving any actions occurring while under Defendant Ramphal's supervision and any actions going forward. Further, and as a result of arbitrary discipline, Plaintiff was demoted to a job in the sanitation department. Plaintiff's demotion to the sanitation department is specifically tied to improper discipline. The jury heard testimony regarding the company's progressive discipline system, see, e.g., Apr. 18 Trial Tr. at 123:8–18, and that in 2013 Plaintiff reached the last step and, pursuant to the CBA, could have been terminated by his company. The company, instead, transferred Plaintiff to the sanitation department and issued a last chance agreement that would have prohibited

Plaintiff from grieving the company's conduct with the union, but which Plaintiff ultimately did not sign.

The jury heard Defendants' and Plaintiff's versions of events that led to Plaintiff's transfer to the sanitation department. Defendants' witnesses testified that Plaintiff was properly disciplined in January of 2013 for being a no call/no show, see Apr. 18 Trial Tr. at 124:4–23 (manager Mendonca's testimony regarding the January 2013 incident), 205:18–208:9 (human resources manager Troche's testimony regarding the same incident), and in October of 2013 for failing to load a truck with the correct product, see Apr. 18 Trial Tr. at 228:2–230:12 (human resources manager Troche's testimony regarding the October 2013 incident), and that as a result, reached the last step of the progressive discipline system, warranting his termination. See Apr. 18 Trial Tr. at 229:4–11. However, according to human resources manager Troche, the company decided not to terminate Plaintiff, given his long career with the company, and instead, as a courtesy, moved Plaintiff to sanitation. See Apr. 18 Trial Tr. at 229:15–23. The jury also heard Plaintiff testify that he was wrongly disciplined in January of 2013 because he was never informed that he had to come in for an earlier shift, see Apr. 19 Trial Tr. at 421:22–427:1, that even if he was scheduled to work, company policy directed that he be called to see why he was missing from work, which was not done, see Apr. 19 Trial Tr. at 427:2–14, that in his experience employees were called and were often not disciplined for the infraction, see Apr. 19 Trial Tr. at 427:15–23, and that he spoke with manager Mendonca about the situation, but who conveyed to Plaintiff that company policy had changed and persons scheduled to work, but missing, would no longer be called and be issued an automatic three-day suspension, without specifics as to when the policy changed. See Apr. 19 Trial Tr. at 429:20–430:25. The jury also heard Gaffney's testimony regarding this incident, which supported Plaintiff's narrative. See Apr. 20 Trial Tr. at 629:9–

631:11.  Plaintiff also testified about the October 2013 discipline, explaining that he was still being trained at that time and that his was not the only name that should have appeared on the loading list, but that "no one would ever put their name on [the list][,]" see Apr. 19 Trial Tr. at 471:2–16, and that he should have been allowed to look at the truck, but was never allowed to do so.  See Apr. 19 Trial Tr. at 471:3–7, 478:3–5.  Plaintiff also testified that at the time of the October 2013 discipline, the company's HR department had yet to respond to two of his grievances citing CBA Article 10, although he followed up with shop steward McBean regarding their status, see Apr. 19 Trial Tr. at 479:17–480:3, and that he spoke to manager Mendonca once again about a meeting and she refused.  See Apr. 19 Trial Tr. at 471:17–472:19.  As a result of the January and October 2013 discipline, Plaintiff was at the termination stage of the progressive discipline.  See Apr. 19 Trial Tr. at 477:16–478:2, 480:12–25.  Plaintiff testified that he was called into a meeting where he was offered a choice to either sign a last chance agreement or be terminated.  See Apr. 19 Trial Tr. at 481:2–8, 486:24–489:15.  He testified that he was told that the last chance agreement would have prevented him from grieving company conduct.  See Apr. 19 Trial Tr. at 481:2–8.  He further testified that the last chance agreement was withdrawn when a union representative present at the meeting objected to the last chance agreement's content, and that instead Plaintiff was moved to a position in the sanitation department.  See Apr. 19 Trial Tr. at 487:9–491:3.  Plaintiff also testified that as a result of this meeting he felt like he could not grieve the October discipline, see Apr. 19 Trial Tr. at 481:1–18, and that the sanitation position was at a lower salary.  See Apr. 19 Trial Tr. at 494:8–25.

Plaintiff also testified that on February 4, 2014, the same day the EEOC sent the notice of charge of discrimination to the company, he informed, via letter, union representative Chris Dempsey that human resources had yet to respond to the two grievances Plaintiff filed citing CBA

Article 10.  See Apr. 19 Trial Tr. at 499:23–450:10, 503:3–505:17.  Plaintiff's grievances were rejected on February 7, 2014, without an explanation.  See Apr. 19 Trial Tr. at 505:21–507:1.  The factual record before the jury was sufficient to make a finding that Plaintiff suffered materially adverse employment actions that were caused by his attempts to report the allegedly discriminatory behavior.  Accordingly, Plaintiff sustained his burden to make out a prima facie case of retaliation.

Although Defendants propose legitimate, non-retaliatory reasons for the complained of materially adverse employment actions, the factual record before the jury was sufficient to make a finding that retaliation was a but-for factor for the adverse action.[34]  Here, the jury could have reasonably concluded that because Plaintiff complained of Defendant Ramphal's treatment, he was improperly disciplined until Plaintiff reached the termination stage of the progressive discipline process and handed the last chance agreement in an attempt to prevent further complaints.  The jury, likewise, could have concluded that the discipline was issued so Plaintiff would be moved to the lesser-paying sanitation department position.  Further, the jury could have also reasonably inferred that Plaintiff lost overtime opportunities as a result of his complaints, as his yearly income decreased while under Defendant Ramphal's supervision, see Apr. 19 Trial Tr. at 372:3–375:9, and at least on one occasion, Plaintiff was denied holiday pay for his failure to work a shift that he testified he was not noticed to work.  See Apr. 19 Trial Tr. at 336:22–338:2.  Therefore, the factual record before the jury was sufficient to make a finding for Plaintiff on the retaliation claim.

---

[34] Defendants also argue that the discipline could not have been retaliatory because there is no affirmative evidence on the record that any of the persons who signed the disciplinary notices knew of Plaintiff's allegations.  See Defs.' Post-Trial Br. at 34–35; Defs.' Reply Br. at 16–17.  As discussed above, Plaintiff presented ample credible evidence from which the jury could have reasonably determined that Defendants and the company generally were aware of Plaintiff's claims.

**E.  The Jury's Award of Punitive Damages**

Defendants argue that the jury's punitive damages award was excessive and unsupported by record evidence, and therefore warrants judgment as a matter of law.  See Defs.' Post-Trial Br. at 36–39.  Plaintiff argues that the jury reasonably determined that punitive damages were warranted because Defendants ignored Plaintiff's complaints, tolerated Defendant Ramphal's treatment of Plaintiff despite being notified of its occurrence, refused to hold a meeting with Plaintiff regarding his complaints or process Plaintiff's grievances timely, and did not adequately train its managerial staff.  See Pl.'s Resp. Br. at 34–38.  For the reasons provided below, the court agrees with Plaintiff.

In a Title VII case, the jury can award punitive damages if it determines that the employer, with "malice" or "reckless indifference," retaliated or discriminated against an employee's federally protected rights.  42 U.S.C. § 1981a(b)(1) (2012); see also Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 572–73 (2d Cir. 2011).  A plaintiff can demonstrate malice or reckless indifference by presenting evidence that the employer retaliated or discriminated against him with the "conscious knowledge it was violating the law," or of "egregious" or "outrageous" conduct from which a jury can infer malice or reckless indifference.  Farias v. Instructional Sys., Inc., 259 F.3d 91, 102 (2d Cir. 2001).  The employer, however, may still escape punitive liability by demonstrating that it "had an antidiscrimination policy" and "made a good faith effort to enforce it." Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 385 (2d Cir. 2001).  The conduct of managerial employees can provide a basis for punitive damages against the corporate employer, unless the employment decisions taken by managerial staff contradicts the

corporate employer's "good-faith efforts to comply with Title VII." <u>Kolstad v. Am. Dental Ass'n</u>, 527 U.S. 526, 545 (1999) (quotation omitted).[35]

The jury's award of punitive damages against Defendant ASR is supported by a preponderance of the evidence. Reviewing the factual record in its totality, the jury could have reasonably determined that Defendant ASR acted with malice or reckless disregard. The jury could also have reasonably determined that Defendant ASR did not make a good faith effort to comply with its existing anti-discrimination policy. Specifically, the jury heard that although employees alleging discrimination are not required to follow the regular company protocol of first discussing the issue with their supervisors, <u>see</u> Apr. 18 Trial Tr. at 167:6–169:4, Plaintiff's grievances citing CBA Article 10 were not processed for failure to follow standard protocol, <u>see</u> Apr. 18 Trial Tr. at 171:2–172:5, that he was told that before he could file a grievance he needed to discuss his allegations of discrimination with his manager, Mendonca, <u>see, e.g.,</u> Apr. 18 Trial Tr. at 181:13–23, but that Mendonca denied Plaintiff's requests for a meeting, <u>see, e.g.,</u> 61:2–63:14, and instead responded that he should just "work it out" with Defendant Ramphal, the very supervisor against whom Plaintiff was complaining. <u>See</u> Apr. 19 Trial Tr. at 360:19–20. The jury also heard testimony that the company did not respond to Plaintiff's grievances citing CBA Article 10 for approximately a year, <u>see</u> Apr. 18 Trial Tr. at 173:11–175:23, and that although manager Mendonca conveyed an intent to discuss Plaintiff's allegations privately with Defendant Ramphal,

---

[35] In their Fed. R. Civ. P. 50(a) motion, Defendants' argued that Plaintiff failed to put forth sufficient evidence as to punitive damages against Defendant ASR because neither Mendonca or Troche constitute "high-level" management at the company. <u>See</u> Apr. 23 Trial Tr. at 913:20–914:6. Defendants' argument is unpersuasive because liability pursuant to 42 U.S.C. § 1981a(b)(1) is imposed when "the agent was employed in a managerial capacity" and was "acting in the scope of employment." <u>Kolstad</u>, 527 U.S. at 542–543 (quoting the Restatement (Second) of Agency § 217 C (1957)). At trial, the testimony offered by Troche, Mendonca, and Plaintiff sufficiently established that Mendonca and Troche acted in their managerial capacities.

see Apr. 18 Trial Tr. at 63:16–64:23, Defendant Ramphal testified that she did not.  See Apr. 20

Trial Tr. at 833:2–5.  The jury also heard manager Mendonca's testimony that in her career with

the company, she was not offered anti-discrimination training, aside from being provided the

company's code of ethics.  See Apr. 18 Trial Tr. at 101:19–102:1.  Therefore, the factual record

before the jury was sufficient to award Plaintiff punitive damages.

### F.  The Jury's Award of Actual Damages

Defendants argue that the jury based its actual damage award on speculation and

approximations offered by Plaintiff.[36]  See Defs.' Post-Trial Br. at 39–43.  Plaintiff argues that

Defendants' argument is based on extra record evidence and that, having failed to object to

Plaintiff's testimony regarding his income during the relevant time, these documents and

Defendants' arguments should be ignored by the court.  See Pl.'s Resp. Br. at 38–39.

Under Title VII, damages such as backpay, lost earnings, or fringe benefits are not limited

by the cap imposed on recovery of compensatory and punitive damages.  See 42 U.S.C. §

1981a(b)(2); see also Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 145 (2d Cir. 1993).  "An

award of backpay is the rule, not the exception[,]" and is awarded to make a plaintiff subject to

discrimination whole.  Carrero v. New York City Hous. Auth., 890 F.2d 569, 580 (2d Cir. 1989)

(superseded by statute on other grounds).[37]  The awarded backpay or lost salary is therefore the

---

[36] As far as Defendants challenge the overtime portion of the jury's actual damages award, see Defs.' Post-Trial Br. at 40–41, their argument is unpersuasive.  The jury did not carve out a portion of the actual damages award specific to overtime and the jury was capable of calculating Plaintiff's actual damages based on the evidence presented at trial.  See discussion infra Section II.F.  The jury's calculation is not unreasonable.  Further, Defendants' reliance on Mugavero in unpersuasive because fringe benefits are not overtime, and because the jury in Mugavero awarded a sum for fringe benefits separate and apart from the sum for plaintiff's lost wages.  See Mugavero v. Arms Acres, Inc., 680 F. Supp. 2d 544, 558, 581 (S.D.N.Y. 2010).

[37] Defendants argue that the court must evaluate whether the jury reasonably awarded actual damages by looking at whether the calculated damages were "establish[ed] with reasonable certainty" and were not "based on pure speculation and conjecture."  Defs.' Post-Trial Br. at 39 (quoting Mugavero, 680 F. Supp. 2d at 581).  However, the text Defendants quote is the standard for damages awarded under New York state

amount of monies the injured party would have earned but-for the discriminatory conduct. Saulpaugh, 4 F.3d at 144–45 (citations omitted).

At trial, Plaintiff testified that he reviewed his W-2 forms several times prior to offering his testimony regarding the loss of wages he experienced while supervised by Defendant Ramphal and throughout the rest of the relevant period.  See Apr. 19 Trial. Tr. at 495:7–19.  Plaintiff then proceeded to explain to the jury the trajectory of losses he experiences in his annual income from 2010 and until 2017.  See, e.g., Apr. 19 Trial Tr. at 372:6–373:22, 494:8–25 (testifying that a year after coming under Defendant Ramphal's supervision, Plaintiff's salary of approximately $77,000 (in 2010) went down to about $69,000, and continued to so decrease as follows—approximately $54,000 in 2012 and 2013 and approximately $49,000 in 2014).  At trial, Defendants' counsel did not object to the line of questioning or lack of evidentiary proof of Plaintiff's claims, other than to raise a foundation objection.  See Apr. 19 Trial Tr. at 373:12–15.  An objection invoking lack of foundation is applicable when a party attempts to introduce an exhibit into evidence, and pursuant to Rule 602 of the Federal Rules of Evidence is rectified if there is evidence demonstrating that the person testifying "has personal knowledge of the matter."  Fed. R. Evid. 602.  The court overruled the objection, see Apr. 19 Trial Tr. at 373:15, because Plaintiff was testifying regarding his own finances and after having reviewed his W-2 forms.  See Apr. 19 Trial. Tr. at 495:7–19. Further, three documents were admitted into evidence at trial that memorialized changes to Plaintiff's salary at the company.  The first document, identified as JX-31, indicates that effective June 27, 2011, Plaintiff's hourly wage went down from $25.34 to $22.73.  See Apr. 19 Trial Tr. at 342:4–343:3 (discussing exhibit JX-31, which reproduces an employee status notice and identifies

---

law, which groups all economic damages together, and case law indicates recognizes that 42 U.S.C. § 1981a forecloses the conflation of compensatory and actual damages.  See Bergerson v. New York State Office of Mental Health, Cent. New York Psychiatric Ctr., 652 F.3d 277, 287 (2d Cir. 2011).

a change in Plaintiff's position and hourly rate, and which was admitted into evidence); Apr. 18

Trial Tr. at 219:22–221:10.  In 2011, Plaintiff was still employed in the processing department.

The second document, identified as JX-18, indicates that effective April 15, 2013, Plaintiff's

hourly wage, as a result of Plaintiff's change in position from centrifugal operator to

warehouseman, went down from $23.64 to $22.67.  See Apr. 18 Trial Tr. at 225:11–227:10

(discussing exhibit JX-18, which reproduces an employee status notice and identifies a change in

Plaintiff's position and hourly rate, and which was admitted into evidence).  The third document,

identified as JX-28, indicates that effective March 14, 2016, Plaintiff's hourly wage, while

employed in the sanitation department, went up from $21.63 to $23.52.  See Apr. 18 Trial Tr. at

230:23–232:5 (discussing exhibit JX-28, which reproduces an employee status notice and

identifies a change in Plaintiff's position and hourly rate, and which was admitted into evidence).

The jury also heard about and had access to the company's CBA, which provides that a worker's

salary will increase by two percent annually.  From the factual record, the jury could have

reasonably awarded Plaintiff actual damages.

### III. DEFENDANTS' MOTION FOR REMITTITUR

        Finally, in the alternative, Defendants request for remittitur of the actual, compensatory

and punitive damages the jury awarded to Plaintiff.  See Defs.' Post-Trial Br. at 43–50.  Plaintiff

argues that the jury's damages verdict is fully supported by the record.  See Pl.'s Resp. Br. at 38–

46.  For the reasons provided below, the court grants Defendants' request for remittitur of the

compensatory damages, and denies Defendants' request for remittitur of the actual and punitive

damages.  On August 15, 2018, the court ruled on Plaintiff's post-trial motions.  See Mem. &

Order [on Pl.'s Post-Trial Mots.], Aug. 15, 2018, ECF No. 207 ("Mem. & Order on Pl.'s Post-

Trial Mots.");  see also Pl.'s Mem. L. Supp. Mot. Allocate Damages & Injunctive Relief at 2–5,

May 30, 2018, ECF No. 195. In its memorandum and order, the court granted Plaintiff's post-trial motion to conform the jury's verdict, and ordered the following—allocate $1 of the compensatory damages award to the Title VII claim and allocate the remaining $249,999 of the compensatory damages award to the NYSHRL claim, and allocate the entire punitive damages award to the Title VII claim and reduce the punitive damages award from $2,000,000 to $299,999, in light of Title VII's statutory cap. See Mem. & Order on Pl.'s Post-Trial Mots. at 4. In light of these allocations, the court reviews Defendants' request for remittitur of the compensatory damages under state law, and its request for remittitur of punitive damages under federal law. Further, for the reasons provided below, the court adjusts Plaintiff's damages as follows: $115,000 in compensatory damages under the NYSHRL, $1 in compensatory damages under Title VII, and $299,999 in punitive damages under Title VII. The court does not disturb the jury's actual damages award, and therefore, Plaintiff is awarded $519,000 in total damages. Plaintiff may elect to either accept these amounts or to proceed to a new trial on damages.

## A. Legal Standard

"Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." Shu–Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 49 (2d Cir. 1984) (citations omitted). Accordingly, if the court determines that the jury's award is excessive, "it may order a new trial, order a new trial limited to damages, or, under the practice of remittitur, condition [the] denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." Ruhling v. Newsday, Inc., No. CV 04-2430(ARL), 2008 WL 2065811, at *4 (E.D.N.Y. May 13, 2008) (citing Cross v. New York City Transit Auth., 417 F.3d 241, 258 (2d Cir. 2005)). A jury's award should be the result of reasoned analysis, and not one of sympathy.

See Scala v. Moore McCormack Lines, Inc., 985 F.2d 680, 684 (2d Cir. 1993). Remittitur is appropriate if it is the latter. Id.

## B. Remittitur of Actual Damages

Defendants argue that the jury's $104,000 actual damages award should be remitted to either $87,320.36 or $48,004.77. See Defs.' Post-Trial Br. at 44–45. Plaintiff argues that Defendants rely on extra record evidence to support their challenge to the jury's actual damages award post-trial, that the court should ignore that evidence, and that Plaintiff fully supported his actual damages claim at trial. See Pl.'s Resp. Br. at 38–39. For the following reasons, the court will not remit Plaintiff's actual damages.

Under Title VII, damages such as backpay, lost earnings, or fringe benefits are not limited by the cap imposed on recovery of compensatory and punitive damages. See 42 U.S.C. § 1981a(b)(2); see also Saulpaugh, 4 F.3d at 145. Actual damages, such as backpay, are imposed with the goal of making the subject of the discrimination whole, see Carrero, 890 F.2d at 580, and Congress intended to vest courts with wide discretion in "fashioning" awards capable of achieving that purpose. Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (1975) (relying and quoting from the legislative history to Title VII).

Defendants attach to their moving post-trial brief seven of Plaintiff's earnings statements. See Certification of Michael T. Hensley, Esq. in Supp. Mot. J. Matter Law, or Alt, New Tr. or Remittitur at Ex. C, May 21, 2018, ECF No. 192-3 (each of the statements captures a week's worth of Plaintiff's salaried pay and overtime, if any, earned over a period of one week in the years 2011–2017). None of these documents were admitted at trial. The jury was not asked to consider these documents, and Defendants' counsel did not object to their absence. The court reviews the record as it is constructed at trial, and will not look at extraneous evidence. Further, there was sufficient

evidence on the record from which the jury could have calculated the $104,000 actual damages amount that it granted. The jury heard Plaintiff's testimony of the progressive decline of his annual salary and also had before it documents providing changes to Plaintiff's hourly pay that took place in 2011, 2013, and 2016. See sources cited supra Section II.F. Specifically, the jury had in front of it Plaintiff's hourly rate before and after June of 2011, and before and after March of 2016. See id. From these documents, a jury could have reconstructed how much Plaintiff's would have earned but-for Defendants' actions.

### C. Remittitur of Compensatory Damages

Defendants argue that the jury's $250,000 compensatory damages award should be remitted to an amount awarded in comparative cases dealing with garden-variety emotional distress claims, or, at the maximum to $30,000. See Defs.' Post-Trial Br. at 45–48. Plaintiff argues that the jury properly calculated the compensatory damages award as Plaintiff's emotional distress claims are "significant," and that the jury's award is comparable to amounts awarded in analogous cases and should not be disturbed. See Pl.'s Resp. Br. at 39–44. For the reasons that follow, the court remits Plaintiff's compensatory damages award under NYSHRL to $115,000.

Under NYSHRL, a plaintiff may recover compensatory damages for mental anguish. Mendez v. Starwood Hotels & Resorts Worldwide, Inc., 746 F. Supp. 2d 575, 600 (S.D.N.Y. 2010). Because $249,999 of Plaintiff's compensatory damages award is allocated to the NYSHRL claim, the court evaluates the excessiveness of the award under New York law. See Stampf v. Long Island R.R., 761 F.3d 192, 204 (2d Cir. 2014). Under New York law, a court "shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c) (McKinney 2016). The "deviates materially" standard used to review state claims is different and less deferential than the "shock the conscience"

standard applied to review jury verdicts in federal claims.  See Gasperini, 518 U.S. at 422–24.  "To

determine whether a jury award is excessive within the meaning of § 5501(c), New York courts

compare it with awards in similar cases."  Stampf, 761 F.3d at 204.  Courts consider "the duration

of a complainant's condition, its severity or consequences, any physical manifestations, and any

medical treatment."  In re New York City Transit Auth., 577 N.E.2d 40, 55 (N.Y. 1991).  The

inquiry under § 5501, however, is not whether there is a deviation from all past awards, but whether

the jury award "deviates materially from reasonable compensation."  Okraynets v. Metro. Transp.

Auth., 555 F. Supp. 2d 420, 439 (S.D.N.Y. 2008).  Further, the "court is not required to remit a

large non-economic damage award, even where evidence of emotional damage consists solely of

plaintiff's testimony."  MacMillan v. Millennium Broadway Hotel, 873 F. Supp. 2d 546, 560

(S.D.N.Y. 2012) (quoting Mendez, 746 F. Supp. 2d at 601).

            In the Second Circuit, non-economic damages can fall into one of three categories—

garden-variety, significant, or egregious.  Awards compensating garden-variety emotional distress

or mental anguish in the Second Circuit range from $30,000 to $125,000.  See, e.g., DeCurtis v.

Upward Bound Int'l, Inc., No. 09 CIV. 5378(RJS), 2011 WL 4549412, at *4 (S.D.N.Y. Sept. 27,

2011); Olsen v. Cty. of Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009); Lynch v. Town of

Southampton, 492 F. Supp. 2d 197, 207 (E.D.N.Y. 2007), aff'd, No. 07-3478-CV, 2008 WL

5083010 (2d Cir. Dec. 2, 2008); Watson v. E.S. Sutton, Inc., No. 02 CIV. 2739 (KMW), 2005 WL

2170659, at *15–16 (S.D.N.Y. Sept. 6, 2005) (collecting cases and explaining that New York

courts' awards of compensatory damages for garden-variety claims vary greatly, with many

reducing awards to $30,000 and below, and many others upholding awards in excess of $100,000

without discussing sthe plaintiff's medical treatment, prolonged suffering, or extreme conduct),

aff'd, 225 F. App'x 3 (2d Cir. 2006).  Evidence in a garden-variety claim is generally provided by

the plaintiff, who describes the mental suffering in "vague or conclusory terms, without relating either the severity or consequences of the injury." Olsen, 615 F. Supp. 2d at 46 (quoting Khan v. Hip Centralized Lab. Servs., Inc., No. CV-03-2411(DGT), 2008 WL 4283348, at *11 (E.D.N.Y. Sept. 17, 2008)).

Courts in this circuit have upheld as not excessive awards compensating significant emotional distress claims ranging from $100,000 to $500,000. See, e.g., Olsen, 615 F. Supp. 2d at 47–49; Simmons v. New York City Transit Auth., No. CV-02-1575, 2008 WL 2788755, at *9–10 (E.D.N.Y. July 17, 2008), aff'd, 340 F. App'x 24 (2d Cir. 2009); Petrovits v. New York City Transit Auth., No. 95 CIV. 9872(DFE), 2003 WL 22349676, at *5 (S.D.N.Y. Oct. 15, 2003). A claim of significant emotional distress differs from that of a garden-variety claim because it is "based on more substantial harm or more offensive conduct, [is] sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." Olsen, 615 F. Supp. 2d at 46–47 (quoting Khan, 2008 WL 4283348, at *11). Courts find emotional distress significant when plaintiffs provide extensive testimony of physical manifestations of their mental anguish, such as hair and weight loss, insomnia, or repeated nightmares, testify to loss of familial and marital relations, have their testimony supported by a mental health professional and corroborated by one or more co-workers, and when plaintiffs continue to experience emotional damage as of the time of trial. See, e.g., Olsen, 615 F. Supp. 2d 35, 47–49 (sustaining awards of $500,000, $400,000, and $100,000 for three plaintiffs who testified to varying levels of significant mental anguish, but all of whom experienced several physical manifestations of their mental anguish and one of whom had to consult a physician out of fear she was having a heart attack, were diagnosed by mental health professionals who testified at trial, and experienced significant lifestyle changes); Thorsen v. Cty.

of Nassau, 722 F. Supp. 2d 277, 292–95 (E.D.N.Y. 2010) (remitting plaintiff's compensatory damages award to $500,000 where plaintiff and his treating psychologist testified at length to his depression and anxiety, where plaintiff suffered a "major stress attack" and required hospitalization, and where plaintiff was falsely blamed for problems in his department in a New York Times article); Mugavero v. Arms Acres, Inc., 680 F. Supp. 2d 544, 578 (S.D.N.Y. 2010) (sustaining a $175,000 compensatory damages award where plaintiff provided corroborating medical evidence of her claims of insomnia and anxiety); Simmons, 2008 WL 2788755, at *9–10 (sustaining a $150,000 compensatory damages award where plaintiff had to move because she was no longer able to afford her accommodation, became depressed, and where her treating psychologist testified that plaintiff's employment situation was the source of her stress).

Plaintiff testified that Defendant Ramphal repeatedly harassed him by using the phrase "you people," which he and witness Gaffney both interpreted to mean the "n word," would use the company's walkie-talkie system, which operated on the same frequency as many of the departments, in a manner that made Plaintiff feel "ridicul[ed]," "degraded," and "very distraught," Apr. 19 Trial Tr. at 352:6–20, and created an atmosphere on the plant floor where other employees would make fun of Plaintiff. See Apr. 19 Trial Tr. at 351:20–352:1. Plaintiff testified that he suffered anxiety at work as a result of having to interact and/or ask questions of Defendant Ramphal, became "very distraught" by how he was treated, spent time in the restroom because "[he] felt like [he] was going to throw up a few times[,]" and at one point did throw up. See Apr. 19 Trial Tr. at 405:5–406:17. Plaintiff explained that the physical manifestation of his emotional distress was the result of Defendant Ramphal's behavior and the lack of response from Defendant ASR. See Apr. 19 Trial Tr. at 406:9–17. Plaintiff testified that he believed Defendant Ramphal

was trying to get him fired, that the increased, improper discipline was part of that attempt, and that his job was in "jeopardy." See Apr. 19 Trial Tr. at 406:18–22.

Plaintiff also testified to seeking treatment from a mental health professional over a period of approximately a year and a half.[38] See Apr. 19 Trial Tr. at 540:5–543:2, 544:23–546:22. At the sessions, Plaintiff testified that he spoke about the relationship with his child and his worries of how the company's retaliation could affect his ability to provide, see, and maintain a relationship with his child. See Apr. 19 Trial Tr. at 541:14–542:3. Plaintiff also testified that he was prescribed Wellbutrin and Prozac, Apr. 19 Trial Tr. at 540:22–25, which he took over the course of a year, but only on weekends or later in the evening out fear of becoming overly relaxed while operating heavy machinery. See Apr. 19 Trial Tr. at 544:23–545:18.

Plaintiff's testimony was supported by witness Schullere, with whom Plaintiff has been friends with since elementary school and who has known Plaintiff throughout his entire career with the company.[39] See Apr. 20 Trial Tr. at 700:20–702:2. Schullere testified that he and Plaintiff speak weekly, Apr. 20 Trial Tr. at 701:14–17, 704:15–16, and that during the time Plaintiff was supervised by Defendant Ramphal, he observed Plaintiff's demeanor "chang[ing] drastically[,]" Apr. 20 Trial Tr. at 704:20, as Plaintiff became "filled with anxiety" and "very depressed." Apr.

---

[38] Defendants argue that it is significant that Plaintiff did not offer any medical records into evidence and that his treating therapist did not testify. See Defs.' Post-Trial Br. at 47, 47 n.4; Defs.' Reply Br. at 21–22. However, compensation for emotional distress in a discrimination action is not "preconditioned" on a plaintiff receiving "treatment, psychiatric or otherwise." See Jowers v. DME Interactive Holdings, Inc., No. 00 CIV. 4753(LTS)(KNF), 2006 WL 1408671, at *3 (S.D.N.Y. May 22, 2006) (citing Gleason v. Callanan Indus. Inc., 610 N.Y.S.2d 671, 673 (N.Y. App. Div. 1994)). Further, in garden-variety claims, the offeror of evidence of mental anguish can solely be the plaintiff.

[39] Defendants argue that Schullere's testimony was hearsay, should have been stricken, and not been considered by the jury as corroborating Plaintiff's claims. Defs.' Post-Trial Br. at 47. The testimony Schullere offered as to Plaintiff's emotional condition during the relevant period of time and how it changed was not hearsay. Schullere's descriptions of his friend's demeanor, changes to his mood, and increased worry over his job were Schullere's own impressions. Further, and contrary to Defendants' claim, Plaintiff did not attempt to enter medical evidence through the testimony of lay witness Schullere. Id. Schullere's testimony was limited to his impressions of his friend's behavior during the relevant time.

20 Trial Tr. at 705:15–16. Schullere also testified that Plaintiff would frequently speak to him about Defendant Ramphal and the work situation generally, and that Plaintiff "was extremely worried" about losing employment and the negative ramifications it could have on the custody dispute. See Apr. 20 Trial Tr. at 705:7–706:19. Seeing the "toll" Plaintiff's work situation was having on "[Plaintiff's] entire life," Apr. 20 Trial Tr. at 705:22, his observation that "[he] had never seen [Plaintiff] at that state," and his belief that "[Plaintiff] was just too devastated to go on without getting any kind of help[,]" Schullere recommended Plaintiff seek treatment. Apr. 20 Trial Tr. at 706:20–25.[40]

In light of the evidence presented and having surveyed the relevant case law, the court concludes that the type of emotional distress Plaintiff alleged most closely resembles garden-variety claims. However, given Plaintiff's allegations and the evidence presented, compensation in the higher end of the range would not be excessive. See, e.g., Patterson v. Balsamico, 440 F.3d 104, 120 (2d Cir. 2006) (sustaining the jury's $100,000 compensatory damages award where "the plaintiff offered testimony of his humiliation, embarrassment, and loss of self-confidence, as well as testimony relating to his sleeplessness, headaches, [and] stomach pains"); DeCurtis, 2011 WL

---

[40] Defendants argue that Plaintiff did not put forth sufficient evidence supporting the inference that his emotional distress arose as a result of Defendants' actions, as Plaintiff had other stressors in his life, namely the child custody dispute and financial issues. Defs.' Post-Trial Br. at 47. However, Plaintiff having several stressors in his life does not detract from the fact that Plaintiff sought treatment at a time when he was supervised by Defendant Ramphal and was motivated to do so as a result of issues he was having at work. Plaintiff being more susceptible to emotional distress because loss of employment would exacerbate the custody issues he was already experiencing can be taken into account to calculate compensatory damages, as Defendants take Plaintiff as they find him, unknown infirmities and all. Further, the court will not opine on whether Plaintiff's emotional distress was the result of any allegations of domestic violence against him. The court's ruling on the motions in limine specifically instructed counsel not to bring up any such claims, see Mem. & Order [on Mots. In Limine] at 2–3, Mar. 26, 2018, ECF No. 144, and at trial, there was no mention of any such allegations. To the extent that Defendants' briefing implies that Plaintiff offered testimony at trial telling the jury of any such allegations by citing to Apr. 19 Trial Tr. at 542:10–20, Defendants grossly misrepresent Plaintiff's testimony.

4549412, at *4 (awarding plaintiff $100,000 in compensatory damages where plaintiff testified to being stressed, losing sleep, dreading going into work and interacting with her supervisor, following several incidents of sexual harassment); Watson, 2005 WL 2170659, at *6, 15–16 (remitting the compensatory damages award to $120,000 where plaintiff was fired after filing a sexual harassment complaint and suffered "considerable distress" as a result of the firing and harassment, but where plaintiff served as the chief source of testimony regarding her treatment and mental states); Petrovits, 2003 WL 22349676, at *5 (sustaining a $150,000 compensatory damages award where plaintiff was called "stupid," "insubordinate," and sought treatment in connection with the sex-based discrimination she was facing at work); Fink v. City of New York, 129 F. Supp. 2d 511, 532, 537–38 (E.D.N.Y. 2001) (awarding $125,000 where plaintiff, for whom work was an "essential element of his identify and of his self-esteem," was humiliated and ridiculed by his co-workers, experienced headaches, became short-tempered, and lost sleep, but who did not seek medical help or offer medical testimony and whose testimony was corroborated by his wife).[41]

Upon considering the evidence in this case and comparable cases, the court determines that an

---

[41] Defendants argue that, at most, Plaintiff suffered garden-variety emotional distress and based on comparable cases, his compensation should not exceed $30,000. See Defs.' Post-Trial Br. at 45–46, 48. Defendants argue that MacMillan is "[t]he most comparable case," and contend that Plaintiff's situation is not as severe as that in Holness, where the court only awarded $50,000. See id. at 48 (citing MacMillan v. Millennium Broadway Hotel, 873 F. Supp. 2d 546, 561–62 (S.D.N.Y. 2012); Holness v. Nat'l Mobile Television, Inc., No. 09 CV 2601(KAM)(RML), 2012 WL 1744847, at *5 (E.D.N.Y. Feb. 14, 2012), report and recommendation adopted as modified, No. 09-CV-2601(KAM)(RML), 2012 WL 1744744 (E.D.N.Y. May 15, 2012)). In MacMillan, the plaintiff did not seek any treatment, did not testify to any physical manifestations of the claimed emotional distress, offered lax testimony describing his mental anguish, and his corroborating witnesses offered only "marginally more descriptive" testimony confirming that plaintiff was "constantly going through [] stress" and that he became "sad" and unlike his former self. See MacMillan, 873 F. Supp. 2d at 561. By contrast, Plaintiff testified that he did seek treatment, was prescribed medication which he took over a course of a year, became fearful of losing his job and being unable to maintain a relationship with his child, and was in a state of anxiety while at work. See Apr. 19 Trial Tr. at 540:5–545:18. Plaintiff's testimony was corroborated by Schullere, a long-time friend. See Apr. 20 Trial Tr. at 700:20–705:16. In Holness, the court relied on a 1999 publication to value the three categories of emotional distress claims and which valued a significant emotional distress claim between $50,000 and $100,000. See Holness, 2012 WL 1744847, at *5 (relying on Rainone v. Potter, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005).

award of $115,000 in compensatory damages under the NYSHRL is the greatest amount that can be awarded to Plaintiff without being excessive. Accordingly, the compensatory damages award is remitted, and it will consist of $115,000 under NYSHRL and $1 under Title VII.

### D. Remittitur of Punitive Damages

Defendants argue that the jury's punitive damages award shocks the judicial conscience, that remittitur to the $300,000 statutory cap would be excessive, and that further remittitur is necessary within the range of $30,000 to $100,000. See Defs.' Post-Trial Br. at 48–50. Plaintiff argues that the jury's determination that Defendant ASR's conduct is reprehensible is supported by the record and that a punitive damages award at the maximum of the Title VII statutory cap does not shock the conscience. See Pl.'s Resp. Br. at 44–46. For the following reasons, the punitive damages award, conformed in light of the statutory cap less one dollar, does not violate due process and will not be remitted further.

In a Title VII case, the jury can award punitive damages if it determines that the employer, with "malice" or "reckless indifference," retaliated or discriminated against an employee's federally protected rights. 42 U.S.C. § 1981a(b)(1); see also Tepperwien, 663 F.3d at 572–73. An award of punitive damages is meant to punish the employer for the bad acts that occurred and deter future repetition of such acts. See Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21 (1991); Lee v. Edwards, 101 F.3d 805, 809 (2d Cir. 1996). The awarded amount should therefore be reasonable and rationally related to achieving these twin purposes, and should not be used to bankrupt the defendant. See Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992).

The Due Process Clause, however, "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003). The court will not disturb a jury's award of punitive damages unless it "shock[s] the

judicial conscience." Mathie v. Fries, 121 F.3d 808, 817 (2d Cir. 1997) (quoting Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir. 1978)). The court evaluates whether a given punitive damages award is excessive using three "guideposts": "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." Lee, 101 F.3d at 809 (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996)). To measure the degree of reprehensibility, noted as "perhaps the most important" factor by the Supreme Court, Gore, 517 U.S. at 575, the court evaluates—"(1) whether the defendant's conduct was violent or threatened violence; (2) whether a defendant acted with deceit or malice and not merely negligence; and (3) whether a defendant has repeatedly engaged in the misconduct." Mendez, 746 F. Supp. 2d at 603 (citing Gore, 517 U.S. at 575–76).

In cases where the misconduct continued over prolonged period of time and was repeated, where complaints were routinely dismissed or not addressed, and/or defendant acted with deceit, courts have determined that the conduct was reprehensible. See, e.g., Watson, 2005 WL 2170659, at *17–19 (finding conduct warranted the punitive damages award where plaintiff's sexual harassment complaints were repeatedly ignored, plaintiff was terminated, and employer filed false information during an EEOC investigation); Luciano v. Olsten Corp., 110 F.3d 210, 213–14, 221 (2d Cir. 1997) (finding conduct warranted the punitive damages award where employer did not review plaintiff's eligibility for a promotion, did not investigate claims of wage disparities between female and male staff in the workplace, eliminated plaintiff's position and refused to create a new position, although new positions were created for male employees with "abysmal" performance); Mugavero, 680 F. Supp. 2d at 588–90 (finding conduct warranted the punitive damages award where plaintiff's written complaint alleging sexual harassment was neither addressed nor

investigated, and where employer reported plaintiff to a state agency on allegations of professional misconduct following her complaint).

The evidence proffered at trial is sufficient to support the conclusion that Defendant ASR's misconduct was reprehensible.  At trial, the evidence showed a company-wide failure to take seriously Plaintiff's complaints of discrimination, and that Plaintiff was subjected to a demotion and loss of overtime opportunities because he complained.  There is evidence on the record supporting a finding that the employer acted maliciously in demoting Plaintiff and issuing improper discipline, while ignoring Plaintiff's complaints regarding Defendant Ramphal's behavior that led to Plaintiff's transfer to a lower-paying position.  Plaintiff testified to being improperly disciplined, and as a result, reaching the final step of the progressive discipline system. Subsequently, the company attempted to get Plaintiff to sign a last chance agreement which would have prevented Plaintiff from grieving not only the treatment he endured under the supervision of Defendant Ramphal, but also anything going forward.  See Apr. 19 Trial Tr. at 486:25–491:3.

Plaintiff also testified to having multiple conversations with manager Mendonca beginning in the fall of 2011 regarding Defendant Ramphal's allegedly discriminatory behavior.  See Apr. 18 Trial Tr. at 58:24–61:1.  Manager Mendonca testified at trial that she did not believe a meeting would resolve the issues and continually declined to allow the meeting to happen, even after several requests from Plaintiff.  See Apr. 18 Trial Tr. at 62:8–63:1, 66:1–5.  Instead, manager Mendonca testified that she told Plaintiff that she would address the issues he brought to her attention with Defendant Ramphal herself and that she did so following every conversation with Plaintiff on this matter.  See Apr. 18 Trial Tr. at 63:16–64:23.  However, during trial, Defendant Ramphal testified that no one at the company made him aware of Plaintiff's complaints against him until October of 2016.  See Apr. 20 Trial Tr. at 826:2–828:13.  Further, manager Mendonca

testified that she spoke with human resources manager Troche regarding Plaintiff's request for a meeting and that she did not believe a meeting would be productive.  See Apr. 18 Trial Tr. at 61:2– 62:7.  Human resources manager Troche confirmed that she spoke with manager Mendonca about a meeting, that she knew Plaintiff attempted to set up a meeting with Mendonca and was denied, and that "any time [Plaintiff] came to [her], [she] would say, you need to speak to Liz [Mendonca] about it."  Apr. 18 Trial Tr. at 181:19–20, 185:9–18.  However, Troche also testified that she "wouldn't condone" managers refusing a meeting with their employees, upon request, Apr. 18 Trial Tr. at 185:6–8, and that although she knew that Plaintiff had already spoken with Mendonca, Apr. 18 Trial Tr. at 181:8–182:2, her practice was to "always refer the employees back to their supervisors or manager to work out the issues."  Apr. 18 Trial Tr. at 181:22–23.  At that time Defendant Ramphal was Plaintiff's supervisor, and according to Plaintiff, Defendant Ramphal continued to use discriminatory language against him.  See, e.g., Apr. 19 Trial Tr. at 349:15–351:2, 356:6–359:9, 366:9–17, 431:3–11.  Plaintiff presented evidence that, Defendant ASR never conducted an investigation into Plaintiff's claims, nor followed the procedures outlined in the company's code of conduct.  For example, at trial, human resources manager Troche testified that the company's code of conduct allows an employee alleging discrimination to bypass the standard procedure of first reporting a given issue to their supervisor, and can instead report the discrimination directly to human resources.  See Apr. 18 Trial Tr. at 167:6–169:4.  The jury also heard Troche testify that the company is obligated to respond to a grievance within ten days.  See Apr. 18 Trial Tr. at 170:15–17.  However, the jury heard testimony that Plaintiff filed two grievances citing CBA Article 10 discrimination with human resources, that these grievances were initially not processed for failure to follow the standard procedure, and that one of these grievances was denied a year later.  See Apr. 18 Trial Tr. at 169:17–175:23; see also Apr. 19 Trial Tr. at

462:24–469:1 (Plaintiff's testimony).    The jury also heard testimony that Plaintiff reported Defendant Ramphal's behavior to manager Mendonca and human resources manager Troche and requested a meeting to discuss this behavior, but was denied on several occasions.  See, e.g., Apr. 18 Trial Tr. at 61:2–63:14, 171:2–175:17, 180:14–182:12; Apr. 19 Trial Tr. at 359:10–372:2. From the actions of Defendant ASR's staff, the jury could appropriately find malice and deceit.

The jury also heard about repeated acts of retaliation.   Plaintiff testified that he lost overtime after complaining about Defendant Ramphal's conduct, was forced to transfer into a lower-paying position to escape Defendant Ramphal's conduct because his oral complaints and written grievances were rejected or dismissed, and was ultimately demoted to a lower-paying position in sanitation.  See, e.g., Apr. 19 Trial Tr. at 372:3–17, 374:7–375:9, 336:8–342:3, 403:24– 409:14, 477:16–478:2, 480:12–481:18, 487:1–491:3, 494:8–25.

The ratio of the punitive damages to the compensatory damages does not violate due process.  The jury's award of $2 million in punitive damages and $354,000 in compensatory and actual damages represents a ratio of approximately 5.7 to 1.   The court remitted Plaintiff's compensatory damages award to $115,000, and conformed the jury's punitive damages to the statutory cap, i.e., $300,000, less one dollar.  See Mem. & Order on Pl.'s Post-Trial Mots. at 4. There is little disparity between an award of $299,999 in punitive damages and an award of $219,000 in compensatory and actual damages.  Therefore, the punitive damages are "reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." State Farm, 538 U.S. at 426.

Finally, the punitive damages award is reasonable in comparison to awards in comparable cases.   The monetary amounts set by the Title VII caps are considered to reflect what "an appropriate civil penalty [would be] for comparable misconduct."  Thomas v. iStar Fin., Inc., 508

F. Supp. 2d 252, 263 (S.D.N.Y. 2007) (citing <u>Lamberson v. Six West Retail Acquisition, Inc.</u>, No. 98 CIV 8053, 2002 WL 59424, at *7 (S.D.N.Y. Jan. 16, 2002)).  Comparable cases in the context of Title VII claims are constrained by the statutory caps, and have allowed plaintiffs like the Plaintiff here to recover $300,000 or the equivalent maximum statutory cap.  <u>See, e.g.</u>, <u>Luciano</u>, 110 F.3d at 222 (upholding a $300,000 punitive damage award against wealthy defendant as "modest"); <u>Mugavero</u>, 680 F. Supp. 2d at 590 (remitting to $200,000, the statutory permissible cap).  Punitive damages are meant to punish the committed misconduct and serve as deterrence against recommitting the same bad acts in the future.  Given the size of Defendant ASR, a punitive damages award of $299,999 is not unduly burdensome, is within the appropriate range and reflects the seriousness of the malfeasance.  In light of the evidence and testimony offered in this case, a lower award would not adequately deter similar conduct in the future or punish Defendant ASR for its systematic failure to address Plaintiff's complaints.

**CONCLUSION**

For the reasons set forth, it is

**ORDERED** that Defendants' post-trial motion for a new trial is denied; and it is further

**ORDERED** that Defendants' renewed motion for judgment as a matter of law is denied; and it is further

**ORDERED** that Defendants' post-trial motion for remittitur of the actual and punitive damages is denied; and it is further

**ORDERED** that Defendants' post-trial motion for remittitur of the compensatory damages is granted; and it is further

**ORDERED** that Plaintiff shall notify the court of its decision to either accept the adjusted damages amounts or, in the alternative, proceed to a new trial on damages on or before Monday, September 17, 2018; and it is further

**ORDERED** that if Plaintiff agrees to the court's remittitur of the compensatory damages, Plaintiff shall file its application for attorneys' fees and costs, if any, on or before Monday, September 24, 2018.




  /s/ Claire R. Kelly
Claire R. Kelly, Judge


Dated: August 17, 2018
         New York, New York